*563 DENNIS JACOBS, Chief Judge:
Maher Arar appeals from a judgment of the United States District Court for the Eastern District of New York (Trager, /.) dismissing his complaint against the Attorney General of the United States, the Secretary of Homeland Security, the Director of the Federal Bureau of Investigation, and others, including senior immigration officials. Arar alleges that he was detained while changing planes at Kennedy Airport in New York (based on a warning from Canadian authorities that he was a member of A1 Qaeda), mistreated for twelve days while in United States custody, and then removed to Syria via Jordan pursuant to an inter-governmental understanding that he would be detained and interrogated under torture by Syrian officials. The complaint alleges a violation of the Torture Victim Protection Act (“TVPA”) and of his Fifth Amendment substantive due process rights arising from the conditions of his detention in the United States, the denial of his access to counsel and to the courts while in the United States, and his detention and torture in Syria.
The district court dismissed the complaint (with leave to re-plead only as to the conditions of detention in the United States and his access to counsel and the courts during that period) and Arar timely appealed (without undertaking to amend). Arar v. Ashcroft, 414 F.Supp.2d 250 (E.D.N.Y.2006). A three-judge panel of this Court unanimously held that: (1) the District Court had personal jurisdiction over Thompson, Ashcroft, and Mueller; (2) Arar failed to state a claim under the TVPA; and (3) Arar failed to establish subject matter jurisdiction over his request for a declaratory judgment. Arar v. Ashcroft, 532 F.3d 157 (2d Cir.2008). A majority of the panel also dismissed Arar’s Bivens claims, with one member of the panel dissenting. Id. The Court voted to rehear the appeal in banc. We now affirm.
We have no trouble affirming the district court’s conclusions that Arar sufficiently alleged personal jurisdiction over the defendants who challenged it, and that Arar lacks standing to seek declaratory relief. We do not reach issues of qualified immunity or the state secrets privilege. As to the TVPA, we agree with the unanimous position of the panel that Arar insufficiently pleaded that the alleged conduct of United States officials was done under color of foreign law. We agree with the district court that Arar insufficiently pleaded his claim regarding detention in the United States, a ruling that has been reinforced by the subsequent authority of Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Our attention is therefore focused on whether Arar’s claims for detention and torture in Syria can be asserted under Bivens v. Six Unknoum Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (“Bivens ”).
To decide the Bivens issue, we must determine whether Arar’s claims invoke Bivens in a new context; and, if so, whether an alternative remedial scheme was available to Arar, or whether (in the absence of affirmative action by Congress) “ ‘special factors counsel[ ] hesitation.’ ” See Wilkie v. Robbins, 551 U.S. 537, 550, 127 S.Ct. 2588, 168 L.Ed.2d 389 (2007) (quoting Bush v. Lucas, 462 U.S. 367, 378, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983)). This opinion holds that “extraordinary rendition” is a context new to Bivens claims, but avoids any categorical ruling on alternative remedies — because the dominant holding of this opinion is that, in the context of extraordinary rendition, hesitation is warranted by special factors. We there *564 fore affirm. (The term “rendition” and its related usages are defined and discussed in the margin.[1])
Our ruling does not preclude judicial review and oversight in this context. But if a civil remedy in damages is to be created for harms suffered in the context of extraordinary rendition, it must be ereated by Congress, which alone has the institutional competence to set parameters, delineate safe harbors, and specify relief, If Congress chooses to legislate on this *565 subject, then judicial review of such legislation would be available.
Applying our understanding of Supreme Court precedent, we decline to create, on our own, a new cause of action against officers and employees of the federal government. Rather, we conclude that, when a case presents the intractable “special factors” apparent here, see infra at 574, it is for the Executive in the first instance to decide how to implement extraordinary rendition, and for the elected members of Congress — and not for us as judges — to decide whether an individual may seek compensation from government officers and employees directly, or from the government, for a constitutional violation. Administrations past and present have reserved the right to employ rendition, see David Johnston, U.S. Says Rendition to Continue, but with More Oversight, N.Y. Times, Aug. 24, 2009, and not withstanding prolonged public debate, Congress has not prohibited the practice, imposed limits on its use, or created a cause of action for those who allege they have suffered constitutional injury as a consequence.
I
Arar’s complaint sets forth the following factual allegations.
Arar is a dual citizen of Syria, where he was born and raised, and of Canada, to which his family immigrated when he was 17.
While on vacation in Tunisia in September 2002, Arar was called back to work in Montreal. His itinerary called for stops in Zurich and New York.
Arar landed at Kennedy Airport around noon on September 26. Between planes, Arar presented his Canadian passport to an immigration official who, after checking Arar’s credentials, asked Arar to wait nearby. About two hours later, Arar was fingerprinted and his bags searched. Between 4 p.m. and 9 p.m., Arar was interviewed by an agent from the Federal Bureau of Investigation (“FBI”), who asked {inter alia) about his relationships with certain individuals who were suspected of terrorist ties. Arar admitted knowing at least one of them, but denied being a member of a terrorist group. Following the FBI interview, Arar was questioned by an official from the Immigration and Nationalization Service (“INS”) for three more hours; he continued to deny terrorist affiliations.
Arar spent the night alone in a room at the airport. The next morning (September 27) he was questioned by FBI agents from approximately 9 a.m. until 2 p.m.; the agents asked him about Osama Bin Laden, Iraq, Palestine, and other things. That evening, Arar was given an opportunity to return voluntarily to Syria. He refused, citing a fear of torture, and asked instead to go to Canada or Switzerland. Later that evening, he was transferred to the Metropolitan Detention Center (“MDC”) in Brooklyn, where he remained until October 8.
On October 1, the INS initiated removal proceedings, and served Arar with a document stating that he was inadmissible because he belonged to a terrorist organization. Later that day, he called his mother-in-law in Ottawa — his prior requests to place calls and speak to a lawyer having been denied or ignored. His family retained a lawyer to represent him and contacted the Canadian Consulate in New York.
A Canadian consular official visited Arar on October 3. The next day, immigration officers asked Arar to designate in writing the country to which he would want to be removed. He designated Canada. On the evening of October 5, Arar met with his *566 attorney. The following evening, a Sunday, Arar was again questioned by INS officials. The INS District Director in New York left a voicemail message on the office phone of Arar’s attorney that the interview would take place, but the attorney did not receive the message in time to attend. Arar was told that she chose not to attend. In days following, the attorney was given false information about Arar’s whereabouts.
On October 8, 2002, Arar learned that the INS had: (1) ordered his removal to Syria, (2) made a (required) finding that such removal would be consistent with Article 3 of the Convention Against Torture (“CAT”),[2] and (3) barred him from reentering the United States for five years. He was found inadmissible to the United States on the basis of 8 U.S.C. § 1182(a)(3)(B)(i)(V), which provides that any alien who “is a member of a terrorist organization” is inadmissible to the United States. The finding was based on Arar’s association with a suspected terrorist and other (classified) information. Thereafter, Defendant J. Scott Blackman, an INS Regional Director, made a determination that Arar was clearly and unequivocally a member of A1 Qaeda and inadmissible to the United States. A “Final Notice of Inadmissibility,” dated October 8, and signed by Defendant Deputy Attorney General Larry Thompson, stated that Arar’s removal to Syria would be consistent with the CAT, notwithstanding Arar’s articulated fear of torture.
Later that day, Arar was taken to New Jersey, whence he flew in a small jet to Washington, D.C., and then to Amman, Jordan. When he arrived in Amman on October 9, he was handed over to Jordanian authorities who treated him roughly and then delivered him to the custody of Syrian officials, who detained him at a Syrian Military Intelligence facility. Arar was in Syria for a year, the first ten months in an underground cell six feet by three, and seven feet high. He was interrogated for twelve days on his arrival in Syria, and in that period was beaten on his palms, hips, and lower back with a two-inch-thick electric cable and with bare hands. Arar alleges that United States officials conspired to send him to Syria for the purpose of interrogation under torture, and directed the interrogations from abroad by providing Syria with Arar’s dossier, dictating questions for the Syrians to ask him, and receiving intelligence learned from the interviews.
On October 20, 2002, Canadian Embassy officials inquired of Syria as to Arar’s whereabouts. The next day, Syria confirmed to Canada that Arar was in its custody; that same day, interrogation ceased. Arar remained in Syria, however, receiving visits from Canadian consular officials. On August 14, 2003, Arar defied his captors by telling the Canadians that he had been tortured and was confined to a small underground cell. Five days later, after signing a confession that he had trained as a terrorist in Afghanistan, Arar was moved to various locations. On October 5, 2003, Arar was released to the custody of a Canadian embassy official in *567 Damascus, and was flown to Ottawa the next day.
II
On January 22, 2004, Arar filed a four-count complaint in the Eastern District of New York seeking damages from federal officials for harms suffered as a result of his detention and confinement in the United States and his detention and interrogation in Syria. Count One of Arar’s complaint seeks relief under the Torture Victim Protection Act (“TVPA”), 28 U.S.C. § 1350 note (a)(1) (the “TVPA claim”). Counts Two and Three seek relief under the Fifth Amendment for Arar’s alleged torture in Syria (Count Two) and his detention there (Count Three). Count Four seeks relief under the Fifth Amendment for Arar’s detention in the United States prior to his removal to Syria. Arar also seeks a declaratory judgment that defendants’ conduct violated his “constitutional, civil, and human rights.”
Defendants-Appellees moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b), challenging personal jurisdiction over Defendants Ashcroft, Thompson, and Mueller and challenging subject-matter jurisdiction as to the claims alleging confinement and torture in Syria on the ground that they arise from an order of removal and are therefore subject to the jurisdictional bar of the Immigration and Nationality Act (see infra Part VI). It was also argued that Arar lacked standing to seek a declaratory judgment.
On February 16, 2006, the district court dismissed Counts One, Two, and Three with prejudice, and Count Four without prejudice. Arar v. Ashcroft, 414 F.Supp.2d 250, 287-88 (E.D.N.Y.2006). The district court also concluded that Arar lacked standing to bring a claim for declaratory relief. Id. at 258-59.
Arar elected not to re-plead Count Four, and on August 17, 2006, the district court entered judgment dismissing all of Arar’s claims. Arar timely appealed. A divided three-judge panel of this Court affirmed on June 30, 2008. Arar v. Ashcroft, 532 F.3d 157 (2d Cir.2008). The Court voted to rehear the case in banc, and oral argument was heard on December 9, 2008.
III
We review de novo the district court’s decision to grant a motion to dismiss. In re NYSE Specialists Sec. Litig., 503 F.3d 89, 95 (2d Cir.2007). In so doing, we accept as true the factual allegations of the complaint, and construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff. Roth v. Jennings, 489 F.3d 499, 501 (2d Cir.2007); see also Conyers v. Rossides, 558 F.3d 137, 143 (2d Cir.2009).
At the outset, we conclude (as the panel concluded unanimously) that Arar: (1) sufficiently alleged personal jurisdiction over the defendants, and (2) has no standing to seek declaratory relief; in addition, because we dismiss the action for the reasons set forth below, we need not (and do not) reach the issues of qualified immunity or the state secrets privilege.
This opinion owes a debt to the panel opinions.
IV
The TVPA creates a cause of action for damages against any “individual who, under actual or apparent authority, or color of law, of any foreign nation ... subjects an individual to torture.” 28 U.S.C. § 1350 note (a)(1). Count One of Arar’s complaint alleges that the defendants conspired with Jordanian and Syrian officials to have Arar tortured in direct violation of the TVPA.
*568 Any allegation arising under the TVPA requires a demonstration that the defendants acted under color of foreign law, or under its authority. Kadic v. Karadzic, 70 F.3d 232, 245 (2d Cir.1995). “In construing the term[ ] ... ‘color of law,’ courts are instructed to look ... to jurisprudence under 42 U.S.C. § 1983....” Id. (citing H.R.Rep. No. 367, 102d Cong., 2d Sess., at 5 (1991) reprinted in 1992 U.S.C.C.A.N. 84, 87). Under section 1983, “[t]he traditional definition of acting under color of state law requires that the defendant ... have exercised power ‘possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.’” West v. Atkins, 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (quoting United States v. Classic, 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941)). The determination as to whether a non-state party acts under color of state law requires an intensely fact-specific judgment unaided by rigid criteria as to whether particular conduct may be fairly attributed to the state. See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass’n, 531 U.S. 288, 295, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001). A federal officer who conspires with a state officer may act under color of state law, see Beechwood Restorative Care Ctr. v. Leeds, 436 F.3d 147, 154 (2d Cir.2006); but since “federal officials typically act under color of federal law,” they are rarely deemed to have acted under color of state law. Strickland ex rel. Strickland v. Shalala, 123 F.3d 863, 866 (6th Cir.1997) (emphasis in original).
Accordingly, to state a claim under the TVPA, Arar must adequately allege that the defendants possessed power under Syrian law, and that the offending actions (i.e., Arar’s removal to Syria and subsequent torture) derived from an exercise of that power, or that defendants could not have undertaken their culpable actions absent such power. The complaint contains no such allegation. Arar has argued that his allegation of conspiracy cures any deficiency under the TVPA. But the conspiracy allegation is that United States officials encouraged and facilitated the exercise of power by Syrians in Syria, not that the United States officials had or exercised power or authority under Syrian law. The defendants are alleged to have acted under color of federal, not Syrian, law, and to have acted in accordance with alleged federal policies and in pursuit of the aims of the federal government in the international context. At most, it is alleged that the defendants encouraged or solicited certain conduct by foreign officials. Such conduct is insufficient to establish that the defendants were in some way clothed with the authority of Syrian law or that their conduct may otherwise be fairly attributable to Syria. See, e.g., Harbury v. Hayden, 444 F.Supp.2d 19, 42-43 (D.D.C.2006), aff'd on other grounds, 522 F.3d 413 (D.C.Cir.2008). We therefore agree "with the unanimous holding of the panel and affirm the District Court’s dismissal of the TVPA claim.[3]
*569 Y
Count Four of the complaint alleges that the conditions of confinement in the United States (prior to Arar’s removal to Syria), and the denial of access to courts during that detention, violated Arar’s substantive due process rights under the Fifth Amendment. The District Court dismissed this claim — without prejudice — as insufficiently pleaded, and invited Arar to re-plead the claim in order to “articulate more precisely the judicial relief he was denied” and to “name those defendants that were personally involved in the alleged unconstitutional treatment.” Arar, 414 F.Supp.2d at 286, 287. Arar elected (in his counsel’s words) to “stand on the allegations of his original complaint.”
On a motion to dismiss, courts require “enough facts to state a claim to relief that is plausible on its face.”. Twombly, 550 U.S. at 570, 127 S.Ct. 1955; see also Ashcroft v. Iqbal, — U.S. -, 129 S.Ct. 1937, 1949-50, 173 L.Ed.2d 868 (2009). “Factual allegations must be enough to raise a right to relief above the speculative level.... ” Twombly, 550 U.S. at 555, 127 S.Ct. 1955. Broad allegations of conspiracy are insufficient; the plaintiff “must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end.” Webb v. Goord, 340 F.3d 105, 110 (2d Cir.2003) (internal quotation marks omitted) (addressing conspiracy claims under 42 U.S.C. § 1985). Furthermore, a plaintiff in a Bivens action is required to allege facts indicating that the defendants were personally involved in the claimed constitutional violation. See Ellis v. Blum, 643 F.2d 68, 85 (2d Cir.1981); see also Thomas v. Ashcroft, 470 F.3d 491, 496 (2d Cir.2006).
Arar alleges that “Defendants” — undifferentiated — “denied Mr. Arar effective access to consular assistance, the courts, his lawyers, and family members” in order to effectuate his removal to Syria. But he fails to specify any culpable action taken by any single defendant, and does not allege the “meeting of the minds” that a plausible conspiracy claim requires. He alleges (in passive voice) that his requests to make phone calls “were ignored,” and that “he was told” that he was not entitled to a lawyer, but he fails to link these denials to any defendant, named or unnamed. Given this omission, and in view of Arar’s rejection of an opportunity to re-plead, we agree with the District Court and the panel majority that this Count of the complaint must be dismissed.
We express no view as to the sufficiency of the pleading otherwise, that is, whether the conduct alleged (if plausibly attributable to defendants) would violate a constitutionally protected interest.[4] To the extent that this claim may be deemed to be a Bivens-type action, it may raise some of the special factors considered later in this opinion.
VI
Arar’s remaining claims seek relief on the basis of torture and detention in Syria, and are cast as violations of substantive *570 due process. At the outset, Defendants argue that the jurisdictional bar of the INA deprived the District Court of subject-matter jurisdiction over these counts because Arar’s removal was conducted pursuant to a decision that was “at the discretion” of the Attorney General.
“[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.” Harisiades v. Shaughnessy, 342 U.S. 580, 588-89, 72 S.Ct. 512, 96 L.Ed. 586 (1952). Accordingly, the INA requires an alien to seek relief only through judicial review of a removal order in the appropriate court of appeals; it entirely forecloses judicial review of decisions of the Attorney General or the Secretary of Homeland Security specified by the INA to be within the discretion of those officers. See 8 U.S.C. § 1252.[5]
However, the application of the INA’s jurisdictional bar is problematic in this case because the proceedings under the INA are alleged to have been irregular in several respects.
First, the complaint alleges that the government took the following actions that impaired Arar’s timely ability to seek the judicial review normally afforded under the INA and to receive any meaningful relief: denying his requests to contact an attorney or his family; misleading his lawyer (after one was retained for him) as to his location and status, thereby frustrating any advocacy on his behalf; and serving the removal order on Arar en route to Amman, when he no longer had access to his attorney and could not make use of the review process. The complaint also alleges that the government undertook extraordinary rendition in clear violation of the protections afforded aliens by the INA, suggesting that the government itself might not have viewed the INA as the real source of its removal authority in this context. However, mere allegations of obstruction generally do not circumvent a congressionally mandated remedial scheme. Otherwise, limitations on the jurisdiction of the district courts could easily be evaded and thwarted.
Second, although the INA governs the status of aliens in transit at United States airports, and clearly has a role in such circumstances, see 8 U.S.C. § 1182(d)(4)(C), this is not a typical immigration case according to the complaint: Arar took no step to enter or stay in this country; he was changing planes to go elsewhere, repeatedly expressed his desire to return to Canada, and was ticketed to Montreal. Even though this case does not present the familiar fact pattern of an alien trying to enter or remain in the United States, our immigration laws apply *571 with equal force to aliens who seek admission to our country and to aliens whom the government seeks to keep out of our country.
In short, it is not clear that the INA’s judicial review provisions govern circumstances of involuntary rendition such as those alleged here. Indeed, rendition may take place in circumstances that in no way implicate United States immigration laws, such as when a person is detained abroad and rendered to some third country.
Finally, even if the INA’s jurisdictional bar is surmounted and review not foreclosed, Arar has alleged circumstances that would have prevented him from obtaining review. If, as he alleges, he was served with the removal order while he was already en route to Amman, the INA could have afforded him no relief then (and can afford him no affirmative relief at this time in this case).
In any event, we need not decide the vexed question of whether the INA bar defeats jurisdiction of Arar’s substantive due process claims, because we conclude below that the case must be dismissed at the threshold for other reasons.
VII
In Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the Supreme Court “recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen’s constitutional rights.” Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 66, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001). The plaintiff in Bivens had been subjected to an unlawful, warrantless search which resulted in his arrest. Bivens, 403 U.S. at 389-90, 91 S.Ct. 1999. The Supreme Court allowed him to state a cause of action for money damages directly under the Fourth Amendment, thereby giving rise to a judicially-created remedy stemming directly from the Constitution itself. Id. at 397, 91 S.Ct. 1999.
The purpose of the Bivens remedy “is to deter individual federal officers from committing constitutional violations.” Malesko, 534 U.S. at 70, 122 S.Ct. 515. So a Bivens action is brought against individuals, and any damages are payable by the offending officers. Carlson v. Green, 446 U.S. 14, 21, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980). Notwithstanding the potential breadth of claims that would serve that objective, the Supreme Court has warned that the Bivens remedy is an extraordinary thing that should rarely if ever be applied in “new contexts.” See Malesko, 534 U.S. at 69, 122 S.Ct. 515 (internal quotation marks omitted); Schweiker v. Chilicky, 487 U.S. 412, 421, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988); see also Dotson v. Griesa, 398 F.3d 156, 166 (2d Cir.2005) (“Because a Bivens action is a judicially created remedy ... courts proceed cautiously in extending such implied relief ----”). In the 38 years since Bivens, the Supreme Court has extended it twice only: in the context of an employment discrimination claim in violation of the Due Process Clause, Davis v. Passman, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979); and in the context of an Eighth Amendment violation by prison officials, Carlson, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15; see also Wilkie v. Robbins, 551 U.S. 537, 550, 127 S.Ct. 2588, 168 L.Ed.2d 389 (2007) (“[I]n most instances we have found a Bivens remedy unjustified.”); Malesko, 534 U.S. at 68, 122 S.Ct. 515 (“[W]e have consistently refused to extend Bivens liability to any new context or new category of defendants.”). Since Carlson in 1980, the Supreme Court has declined to extend the Bivens remedy in any new direction at all. Among the rejected contexts are: violations of federal employees’ First Amend *572 ment rights by their employers, Bush v. Lucas, 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983); harms suffered incident to military service, United States v. Stanley, 483 U.S. 669, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987); Chappell v. Wallace, 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983); denials of Social Security benefits, Schweiker, 487 U.S. at 412, 108 S.Ct. 2460; claims against federal agencies, FDIC v. Meyer, 510 U.S. 471, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994); claims against private corporations operating under federal contracts, Malesko, 534 U.S. 61, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001); and claims of retaliation by federal officials against private landowners, Wilkie, 551 U.S. at 562, 127 S.Ct. 2588.
This case requires us to examine whether allowing this Bivens action to proceed would extend Bivens to a new “context,” and if so, whether such an extension is advisable.
“Context” is not defined in the case law. At a sufficiently high level of generality, any claim can be analogized to some other claim for which a Bivens action is afforded, just as at a sufficiently high level of particularity, every case has points of distinction. We construe the word “context” as it is commonly used in law: to reflect a potentially recurring scenario that has similar legal and factual components.
The context of this case is international rendition, specifically, “extraordinary rendition.” Extraordinary rendition is treated as a distinct phenomenon in international law. See supra note 1. Indeed, law review articles that affirmatively advocate the creation of a remedy in cases like Arar’s recognize “extraordinary rendition” as the context. See, e.g., Peter Johnston, Note, Leaving the Invisible Universe: Why All Victims of Extraordinary Rendition Need a Cause of Action Against the United States, 16 J.L. & Pol’y 357, 363 (2007). More particularly, the context of extraordinary rendition in Arar’s case is the complicity or cooperation of United States government officials in the delivery of a non-citizen to a foreign country for torture (or with the expectation that torture will take place). This is a “new context”: no court has previously afforded a Bivens remedy for extraordinary rendition.
Once we have identified the context as “new,” we must decide whether to recognize a Bivens remedy in that environment of fact and law. The Supreme Court tells us that this is a two-part inquiry. In order to determine whether to recognize a Bivens remedy in a new context, we must consider: whether there is an alternative remedial scheme available to the plaintiff; and whether “ ‘special factors counsel[ ] hesitation’ ” in creating a Bivens remedy. Wilkie, 551 U.S. at 550, 127 S.Ct. 2588 (quoting Bush, 462 U.S. at 378, 103 S.Ct. 2404).
VIII
There are several possible alternative remedial schemes here. Congress has established a substantial, comprehensive, and intricate remedial scheme in the context of immigration. The INA provides for review of final orders of removal, including review of the government’s designation of a particular destination country and many (albeit not all) decisions of the Attorney General and the Secretary of Homeland Security. See 8 U.S.C. § 1252; Mendis v. Filip, 554 F.3d 335, 338 (2d Cir.2009). Congress has supplemented this general remedial scheme with specific guidance for particular contexts by enacting (i) the Foreign Affairs Reform and Restructuring Act of 1998 (“FARRA”), 8 U.S.C. § 1231 note; see also 8 C.F.R. § 208.16(c); and (ii) the TVPA, which, as already discussed, provides no remedy to *573 Arar. At the same time, Congress has expressly limited review of the removal of aliens who (like Arar) are removable for reasons related to national security. See 8 U.S.C. § 1225(c). Congress has also regularly modified the various review mechanisms to account for perceived difficulties and complications. See, e.g., REAL ID Act of 2005, Pub.L. No. 109-13, div. B, 119 Stat. 302; Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. No. 104-208, div. C, 110 Stat. 3009-546. In light of the complexity of the remedial scheme Congress has created (and frequently amended), we would ordinarily draw a strong inference that Congress intended the judiciary to stay its hand and refrain from creating a Bivens action in this context. See Wilkie, 551 U.S. at 554, 127 S.Ct. 2588; Schweiker, 487 U.S. at 424-29, 108 S.Ct. 2460; Bush, 462 U.S. at 388, 103 S.Ct. 2404.
We recognize, however, that any reliance on the INA as an alternative remedial scheme presents difficulties for the same reasons discussed in Part VI above. Arar has alleged that he was actively prevented from seeking any meaningful review and relief through the INA processes. In the end, we need not decide whether an alternative remedial scheme was available because, “even in the absence of an alternative [remedial scheme], a Bivens remedy is a subject of judgment ... [in which] courts must ... pay particular heed ... to any special factors counselling hesitation before authorizing a new kind of federal litigation.” Wilkie, 551 U.S. at 550, 127 S.Ct. 2588 (internal quotation marks omitted).[6] Such special factors are clearly present in the new context of this case, and they sternly counsel hesitation.
IX
When the Bivens cause of action was created in 1971, the Supreme Court explained that such a remedy could be afforded because that “case involve[d] no special factors counselling hesitation in the absence of affirmative action by Congress.” Bivens, 403 U.S. at 396, 91 S.Ct. 1999. This prudential limitation was expressly weighed by the Court in Davis, 442 U.S. at 245-46, 99 S.Ct. 2264, and Carlson, 446 U.S. at 18-19, 100 S.Ct. 1468, and such hesitation has defeated numerous Bivens initiatives, see, e.g., Stanley, 483 U.S. at 683-84, 107 S.Ct. 3054; Chappell, 462 U.S. at 304, 103 S.Ct. 2362; Wilkie, 551 U.S. at 554-55, 127 S.Ct. 2588; Dotson, 398 F.3d at 166-67. Among the “special factors” that have “counseled] hesitation” and thereby foreclosed a Bivens remedy are: military concerns, Stanley, 483 U.S. at 683-84, 107 S.Ct. 3054; Chappell, 462 U.S. at 304, 103 S.Ct. 2362; separation of powers, United States v. City of Philadelphia, 644 F.2d 187, 200 (3d Cir.1980); the comprehensiveness of available statutory schemes, Dotson, 398 F.3d at 166; national security concerns, Beattie v. Boeing Co., 43 F.3d 559, 563 (10th Cir.1994); and foreign policy considerations, United States v. Verdugo-Urquidez, 494 U.S. 259, 274, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990).
Two principles emerge from this review of case law:
• “Special factors” is an embracing category, not easily defined; but it is limited in terms to factors that provoke “hesitation.” While special factors should be substantial enough to justify the absence of a damages remedy for a *574 wrong, no account is taken of countervailing factors that might counsel alacrity or activism, and none has ever been cited by the Supreme Court as a reason for affording a Bivens remedy where it would not otherwise exist.
• The only relevant threshold — that a factor “counsels hesitation” — is remarkably low. It is at the opposite end of the continuum from the unflagging duty to exercise jurisdiction. Hesitation is a pause, not a full stop, or an abstention; and to counsel is not to require. “Hesitation” is “counseled” whenever thoughtful discretion would pause even to consider.[7]
With these principles in mind, we adduce, one by one, special factors that bear upon the recognition of a Bivens remedy for rendition.
X
Although this action is cast in terms of a claim for money damages against the defendants in their individual capacities, it operates as a constitutional challenge to policies promulgated by the executive. Our federal system of checks and balances provides means to consider allegedly unconstitutional executive policy, but a private action for money damages against individual policymakers is not one of them. A Bivens action is sometimes analogized to an action pursuant to 42 U.S.C. § 1983, but it does not reach so far as to create the federal counterpart to an action under Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Here, we need not decide categorically whether a Bivens action can lie against policymakers because in the context of extraordinary rendition, such an action would have the natural tendency to affect diplomacy, foreign policy, and the security of the nation, and that fact counsels hesitation. Our holding need be no broader.

A. Security and Foreign Policy

The Executive has practiced rendition since at least 1995. See Extraordinary Rendition in U.S. Counterterrorism Policy: The Impact on Transatlantic Relations: Joint Hearing Before the Subcomm. on International Organizations, Human Rights, and Oversight and the Subcomm. on Europe of the H. Comm, on Foreign Affairs, 110th Cong. 15 (2007) (statement of Michael F. Scheuer, Former Chief, Bin Laden Unit, CIA). Arar gives “the mid-1990s” as the date for the inception of the policy under which he was sent to Syria for torture. PL Maher Arar’s Mem. of Law in Opp’n to Defs.’ Invocation of the State Secrets Privilege, Mar. 14, 2005, at 6. A suit seeking a damages remedy against senior officials who implement such a policy is in critical respects a suit against the government as to which the government has not waived sovereign immunity. Such a suit unavoidably influences government policy, probes government secrets, invades government interests, enmeshes government lawyers, and thereby elicits government funds for settlement. (Canada has already paid Arar $10 million.[8])
It is a substantial understatement to say that one must hesitate before extending *575 Bivens into such a context. A suit seeking a damages remedy against senior officials who implement an extraordinary rendition policy would enmesh the courts ineluctably in an assessment of the validity and rationale of that policy and its implementation in this particular case, matters that directly affect significant diplomatic and national security concerns. It is clear from the face of the complaint that Arar explicitly targets the “policy” of extraordinary rendition; he cites the policy twice in his complaint, and submits documents and media reports concerning the practice. His claim cannot proceed without inquiry into the perceived need for the policy, the threats to which it responds, the substance and sources of the intelligence used to formulate it, and the propriety of adopting specific responses to particular threats in light of apparent geopolitical circumstances and our relations with foreign countries.
The Supreme Court has expressly counseled that matters touching upon foreign policy and national security fall within “an area of executive action ‘in which courts have long been hesitant to intrude’ ” absent congressional authorization. Lincoln v. Vigil, 508 U.S. 182, 192, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993) (emphasis added) (quoting Franklin v. Massachusetts, 505 U.S. 788, 819, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992) (Stevens, /., concurring in part and concurring in the judgment)). It “has recognized ‘the generally accepted view that foreign policy was the province and responsibility of the Executive.... Thus, unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs.’ ” Dep’t of Navy v. Egan, 484 U.S. 518, 529-30, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988) (emphasis added) (quoting Haig v. Agee, 453 U.S. 280, 293-94, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981)). This “hesita[tion]” and “reluctan[ce]” is counseled by:
• the constitutional separation of powers among the branches of government, see United States v. Curtiss-Wright Exp. Co., 299 U.S. 304, 320-22 [57 S.Ct. 216, 81 L.Ed. 255] (1936) (noting the “plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations” and discussing the difficulties presented by congressional-let alone judicial — involvement in such affairs), and
• the limited institutional competence of the judiciary, see Boumediene v. Bush, [- U.S. -] 128 S.Ct. 2229, 2276-77 [171 L.Ed.2d 41] (2008) (“Unlike the President and some designated Members of Congress, neither the Members of this Court nor most federal judges begin the day with briefings that may describe new and serious threats to our Nation and its people. The law must accord the Executive substantial authority to apprehend and detain those who pose a real danger to our security.”); see also Munaf v. Geren, [— U.S. -] 128 S.Ct. 2207, 2226 [171 L.Ed.2d 1] (2008) (“The Judiciary is not suited to [make] determinations [in the area of foreign affairs] that would ... undermine the Government’s ability to speak with one voice in this area. In contrast, the political branches are well situated to consider sensitive foreign policy issues, such as whether there is a serious prospect of torture at the hands of any ally, and what to do about it if there is.” (citation omitted)).
True, courts can — with difficulty and resourcefulness — consider state secrets and even reexamine judgments made in the foreign affairs context when they must, *576 that is, when there is an unflagging duty to exercise our jurisdiction. Otherwise:
[T]he special needs of foreign affairs must stay our hand in the creation of damage remedies against military and foreign policy officials for allegedly unconstitutional treatment of foreign subjects causing injury abroad. The foreign affairs implications of suits such as this cannot be ignored' — their ability to produce what the Supreme Court has called in another context “embarrassment of our government abroad” through “multifarious pronouncements by various departments on one question.” Whether or not the present litigation is motivated by considerations of geopolitics rather than personal harm, we think that as a general matter the danger of foreign citizens’ using the courts in situations such as this to obstruct the foreign policy of our government is sufficiently acute that we must leave to Congress the judgment whether a damage remedy should exist.
Sanchez-Espinoza v. Reagan, 770 F.2d 202, 209 (D.C.Cir.1985) 32 (Scalia, J.) (quoting Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)). Absent clear congressional authorization, the judicial review of extraordinary rendition would offend the separation of powers 35 and inhibit this country’s foreign policy. It does not matter for our purposes whether such consequences would flow from innocent interference or from deliberate manipulation. These concerns must counsel hesitation in creating a new damages remedy that Congress has not seen fit to authorize.

B. Classified Information

The extraordinary rendition context involves exchanges among the ministries and agencies of foreign countries on diplomatic, security, and intelligence issues. The sensitivities of such classified material are “too obvious to call for enlarged discussion.” Dep’t of Navy, 484 U.S. at 529, 108 S.Ct. 818 (internal quotation marks omitted). Even the probing of these matters entails the risk that other countries will become less willing to cooperate with the United States in sharing intelligence resources to counter terrorism. “At its core,” as the panel opinion observed, “this suit arises from the Executive Branch’s alleged determination that (a) Arar was affiliated with AI Qaeda, and therefore a threat to national security, and (b) his removal to Syria was appropriate in light of U.S. diplomatic and national security interests.” Arar, 532 F.3d at 181. To determine the basis for Arar’s alleged designation as an Al Qaeda member and his subsequent removal to Syria, the district court would have to consider what was done by the national security apparatus of at least three foreign countries, as well as that of the United States. Indeed, the Canadian government — which appears to have provided the intelligence that United States officials were acting upon when they detained Arar — paid Arar compensation for its role in the events surrounding this lawsuit, but has also asserted the need for Canada itself to maintain the confidentiality of certain classified materials related to Arar’s claims.[9]

C. Open Courts

Allegations of conspiracy among government agencies that must often work in secret inevitably implicate a lot of classified material that cannot be introduced into the public record. Allowing Arar’s claims to proceed would very likely mean that some documents or information *577 sought by Arar would be redacted, reviewed in camera, and otherwise concealed from the public. Concealment does not bespeak wrongdoing: in such matters, it is just as important to conceal what has not been done. Nevertheless, these measures would excite suspicion and speculation as to the true nature and depth of the supposed conspiracy, and as to the scope and depth of judicial oversight. Indeed, after an inquiry at oral argument as to whether classified materials relating to Arar’s claims could be made available for review in camera, Arar objected to the supplementation of the record with material he could not see. See Letter from David Cole, Counsel for Maher Arar (Dec. 23, 2008). After pointing out that such materials are unnecessary to the adjudication of a motion on the pleadings (where the allegations of the complaint must be accepted as true), Arar protested that any materials submitted ex parte and in camera would not be subject to adversarial testing and that consideration of such documents would be “presumptively unconstitutional” since they would result in a decision “on the basis of secret information available to only one side of the dispute.”
The court’s reliance on information that cannot be introduced into the public record is likely to be a common feature of any Bivens actions arising in the context of alleged extraordinary rendition. This should provoke hesitation, given the strong preference in the Anglo-American legal tradition for open court proceedings, a value incorporated into modern First and Sixth Amendment law. See U.S. Const. amend. VI (guaranteeing the right to a “public trial” (emphasis added)); Westmoreland v. Columbia Broad. Sys., Inc., 752 F.2d 16, 23 (2d Cir.1984) (noting that the First Amendment secures “a right of access to civil proceedings”). The risk of limiting access, of course, is that where a proceeding “has been concealed from public view an unexpected outcome can cause a reaction that the system at best has failed and at worst has been corrupted.” Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 571, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). “[T]he appearance of justice can best be provided by allowing people to observe” proceedings. Id. at 572, 100 S.Ct. 2814. “People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing.” Id. This is especially true in the courts, where the guarantee of a public trial “has always been recognized as a safeguard against any attempt to employ our courts as instruments of persecution. The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power.” In re Oliver, 333 U.S. 257, 270, 68 S.Ct. 499, 92 L.Ed. 682 (1948).
Granted, there are circumstances in which a court may close proceedings to which a public right of access presumptively attaches. See Waller v. Georgia, 467 U.S. 39, 45, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984); United States v. Alcantara, 396 F.3d 189, 199-200 (2d Cir.2005); United States v. Doe, 63 F.3d 121, 127-28 (2d Cir.1995). And the problems posed by the need to consider classified material are unavoidable in some criminal prosecutions and in other cases where we have a duty, imposed by Congress, to exercise jurisdiction. But this is not such a circumstance or such a case. The preference for open rather than clandestine court proceedings is a special factor that counsels hesitation in extending Bivens to the extraordinary rendition context.
XI
A government report states that this case involves assurances received from *578 other governments in connection with the determination that Arar’s removal to Syria would be consistent with Article 3 of the CAT. Office of Inspector General, Dep’t of Homeland Sec., (Unclassified) The Removal of a Canadian Citizen to Syria 5, 22, 26-27 (2008).[10] This case is not unique in that respect. Cases in the context of extraordinary rendition are very likely to present serious questions relating to private diplomatic assurances from foreign countries received by federal officials, and this feature of such claims opens the door to graymail.

A. Assurances

The regulations promulgated pursuant to the FARRA explicitly authorize the removal of an alien to a foreign country following receipt from that country of sufficiently reliable assurances that the alien will not be tortured. See 8 C.F.R. § 208.18(c). Should we decide to extend Bivens into the extraordinary rendition context, resolution of these actions will require us to determine whether any such assurances were received from the country of rendition and whether the relevant defendants relied upon them in good faith in removing the alien at issue.
Any analysis of these questions would necessarily involve us in an inquiry into the work of foreign governments and several federal agencies, the nature of certain classified information, and the extent of secret diplomatic relationships. An investigation into the existence and content of such assurances would potentially embarrass our government through inadvertent or deliberate disclosure of information harmful to our own and other states.[11] Given the general allocation of authority over foreign relations to the political branches and the decidedly limited experience and knowledge of the federal judiciary regarding such matters, such an investigation would also implicate grave concerns about the separation of powers and our institutional competence. See, e.g., Kiyemba v. Obama, 561 F.3d 509, 515 (D.C.Cir.2009) (“[Sjeparation of powers principles ... preclude the courts from second-guessing the Executive’s assessment of the likelihood a detainee will be tortured by a foreign sovereign.”). These considerations strongly counsel hesitation in acknowledging a Bivens remedy in this context.

B. Graymail

As emphasized above, Arar invokes Bivens to challenge policies promulgated and pursued by the executive branch, not simply isolated actions of individual federal employees. Such an extension of Bivens is without precedent and implicates questions of separation of powers as well as sovereign immunity. This, by itself, counsels hesitation; there is further reason to hesitate where, as in this case, the challenged government policies are the subject of classified communications: a possibility that such suits will make the government “vulnerable to ‘graymail,’ i.e., individual lawsuits brought to induce the [government] to settle a ease (or prevent its filing) *579 out of fear that any effort to litigate the action would reveal classified information that may undermine ongoing covert operations,” or otherwise compromise foreign policy efforts. Tenet v. Doe, 544 U.S. 1, 11, 125 S.Ct. 1230, 161 L.Ed.2d 82 (2005). We cast no aspersions on Arar, or his lawyers; this dynamic inheres in any case where there is a risk that a defendant might “disclose classified information in the course of a trial.” United States v. Pappas, 94 F.3d 795, 799 (2d Cir.1996). This is an endemic risk in cases (however few) which involve a claim like Arar’s.
The risk of graymail is itself a special factor which counsels hesitation in creating a Bivens remedy. There would be hesitation enough in an ordinary graymail case, ie., where the tactic is employed against the government, which can trade settlement cash (or the dismissal of criminal charges) for secrecy. See Tenet, 544 U.S. at 11, 125 S.Ct. 1230; Pappas, 94 F.3d at 799. But the graymail risk in a Bivens rendition case is uniquely troublesome. The interest in protecting military, diplomatic, and intelligence secrets is located (as always) in the government; yet a Bivens claim, by definition, is never pleaded against the government. See, e.g., Malesko, 534 U.S. at 70, 122 S.Ct. 515. So in a Bivens case, there is a dissociation between the holder of the non-disclosure interest (the government, which cannot be sued directly under Bivens) and the person with the incentive to disclose (the defendant, who cannot waive, but will be hable for any damages assessed). In a rendition case, the Bivens plaintiff could in effect pressure the individual defendants until the government cries uncle. Thus any Bivens action involving extraordinary rendition would inevitably suck the government into the case to protect its considerable interests, and — if disclosure is ordered — to appeal, or to suffer the disclosure, or to pay.
This pressure on the government to pay a settlement has (at least) two further perverse effects. First, a payment from the Treasury tends to obviate any payment or contribution by the individual defendants. Yet, “[Bivens ] is concerned solely with deterring the unconstitutional acts of individual officers” by extracting payment from individual wrongdoers. Malesko, 534 U.S. at 71, 122 S.Ct. 515. When the government elects to settle a Bivens case which is susceptible to graymail, the individual wrongdoer pays nothing and the deterrent effect is lost. Second, the individual defendant in such a case has no incentive to resist discovery that imperils government interests; rather, discovery induces the government to settle. So in the extraordinary rendition context, there is a risk (or likelihood) that the government effectively becomes the real defendant in interest, and the named defendants become proxies that the government cannot control. Precisely because Bivens has never been approved as a Monell-like vehicle for challenging government policies, this factor also counsels hesitation in extending a private damages action in this context.[12]
In the end, a Bivens action based on rendition is — in all but name — a claim *580 against the government.[13] It is not for nothing that Canada (the government, not an individual officer of it) paid Arar $10 million dollars.
XII
In the small number of contexts in which courts have implied a Bivens remedy, it has often been easy to identify both the line between constitutional and unconstitutional conduct, and the alternative course which officers should have pursued. The guard who beat a prisoner should not have beaten him; the agent who searched without a warrant should have gotten one; and the immigration officer who subjected an alien to multiple strip searches without cause should have left the alien in his clothes. This distinction may or may not amount to a special factor counseling hesitation in the implication of a Bivens remedy. But it is surely remarkable that the context of extraordinary rendition is so different, involving as it does a complex and rapidly changing legal framework beset with critical legal judgments that have not yet been made, as well as policy choices that are by no means easily reached.
Consider: should the officers here have let Arar go on his way and board his flight to Montreal? Canada was evidently unwilling to receive him; it was, after all, Canadian authorities who identified Arar as a terrorist (or did something that led their government to apologize publicly to Arar and pay him $10 million).
Should a person identified as a terrorist by his own country be allowed to board his plane and go on to his destination? Surely, that would raise questions as to what duty is owed to the other passengers and the crew.
Or should a suspected terrorist en route to Canada have been released on the Canadian border — over which he could reenter the United States virtually at will? Or should he have been sent back whence his plane came, or to some third country? Should those governments be told that Canada thinks he is a terrorist? If so, what country would take him?
Or should the suspected terrorist have been sent to Guantanamo Bay or — if no other country would take him — kept in the United States with the prospect of release into the general population? See Zadvydas v. Davis, 538 U.S. 678, 699-700, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001).
None of this is to say that extraordinary rendition is or should be a favored policy choice. At the same time, the officials required to decide these vexed issues are “subject to the pull of competing obligations.” Lombardi v. Whitman, 485 F.3d 73, 83 (2d Cir.2007). Many viable actions they might consider “clash with other equally important governmental responsibilities.” Pena v. DePrisco, 432 F.3d 98, 114 (2d Cir.2005) (internal quotation marks omitted). Given the ample reasons for pause already discussed, we need not and do not rely on this consideration in concluding that it is inappropriate to extend Bivens to this context. Still, Congress is the appropriate branch of government to decide under what circumstances (if any) these kinds of policy decisions — which are directly related to the security of the population and the foreign affairs of the coun *581 try — should be subjected to the influence of litigation brought by aliens.
XIII
All of these special factors notwithstanding, we cannot ignore that, as the panel dissent put it, “there is a long history of judicial review of Executive and Legislative decisions related to the conduct of foreign relations and national security.” Arar, 532 F.3d at 213 (Sack,concurring in part and dissenting in part). Where does that leave us? We recognize our limited competence, authority, and jurisdiction to make rules or set parameters to govern the practice called rendition. By the same token, we can easily locate that competence, expertise, and responsibility elsewhere: in Congress. Congress may be content for the Executive Branch to exercise these powers without judicial check. But if Congress wishes to create a remedy for individuals like Arar, it can enact legislation that includes enumerated eligibility parameters, delineated safe harbors, defined review processes, and specific relief to be afforded. Once Congress has performed this task, then the courts in a proper case will be able to review the statute and provide judicial oversight to the “Executive and Legislative decisions [which have been made with regard] to the conduct of foreign relations and national security.”[14]

Id.

*582 CONCLUSION
For the reasons stated above, the judgment of the District Court is affirmed. The panel opinion is hereby vacated.

. The term "rendition” refers to the transfer of a fugitive from one state to another or from one country to another. See Black's Law Dictionary 1410 (9th ed. 2004) (defining "rendition” as "[t]he return of a fugitive from one state to the state where the fugitive is accused or was convicted of a crime”); see also Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 1.9(c) ("[[Interstate rendition[] is specifically provided for in the United States Constitution. In order to implement the rendition clause, Congress enacted the Federal Rendition Act, which requires that the demanding state produce 'a copy of an indictment found or an affidavit made before a magistrate of any State or Territory, charging the person demanded with having committed treason, felony, or other crime, certified as authentic by the governor.’ ” (footnotes omitted)). In the international context, "extradition” is a "distinct form of rendition” in which "one [country] surrenders a person within its territorial jurisdiction to a requesting [country] via a formal legal process, typically established by treaty between the countries.” Cong. Research Serv., Renditions: Constraints Imposed by Laws on Torture 1 (2009); see also 1 Oppenheim’s International Law §§ 415-16 (9th ed. 1996). Although most international renditions occur under a formal extradition treaty, renditions also occur outside the scope of extradition treaties, often as a matter of international comity. See 1 Oppenheim, supra, § 416; Cong. Research Serv., supra, at 1; see also 18 U.S.C. § 3181(b) (permitting, "in the exercise of comity, the surrender of persons, other than citizens, nationals, or permanent residents of the United States, who have committed crimes of violence against nationals of the United States in foreign countries without regard to the existence of any treaty of extradition with such foreign government”). The terms " 'irregular rendition’ and 'extraordinary rendition’ have been used to refer to the extrajudicial transfer of a person from one [country] to another.” Cong. Research Serv., supra, at 1; see also Black's Law Dictionary 1410 (9th ed. 2009) (defining “extraordinary rendition” as "[t]he transfer, without formal charges, trial, or court approval, of a person suspected of being a terrorist or supporter of a terrorist group to a foreign nation for imprisonment and interrogation on behalf of the transferring nation”). As we understand and use the term here, “extraordinary rendition” does not, by itself, imply that a subject of extraordinary rendition will be treated as Arar alleges he was treated during and after the rendition alleged in this action.
The United States Department of State records that, between 1993 and 2001, "rendition” provided the means for obtaining custody of ten suspected terrorists and "extradition” applied to another four suspects. See U.S. Dep’t of State, Patterns of Global Terrorism 2001, App. D: Extraditions and Renditions of Terrorists to the United States. Accordingly, the rendition of suspected terrorists outside the mechanisms established by extradition treaties — so-called extraordinary rendition — had been employed as a means of combating terrorists for nearly a decade prior to the events giving rise to this litigation. See John.B. Bellinger III, Legal Adviser, U.S. Dep't of State, Letter to the Editor, Wall St. J., July 5, 2006, at A25 (discussing the renditions of suspected terrorists Ramzi Yousef and Mir Aimal Kansi to the United States and the rendition of Illich Ramirez Sanchez, also known as "Carlos the Jackal,” by French authorities from the Sudan to France, "which was subsequently upheld by the European Commission on Human Rights”), reprinted in Digest of United States Practice in International Law 162-63 (Sally J. Cummings ed., 2006); see also Remarks of Condoleezza Rice, U.S. Sec’y of State (Dec. 5, 2005) ("For decades, the United States and other countries have used 'renditions' to transport terrorist suspects from the country where they were captured to their home country or to other countries where they can be questioned, held, or brought to justice.”), in Digest of United States Practice in International Law 100, 102 (Sally J. Cummings ed., 2005).

. Article 3 of the Convention Against Torture "prohibits any state party to the Convention from expelling, returning or extraditing any person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture, and provides that the determination of whether such grounds exist [must take] into account all relevant considerations including, where applicable, the existence in the State concerned of a consistent pattern of gross, flagrant or mass violations of human rights.” Tun v. INS, 445 F.3d 554, 566 (2d Cir.2006) (internal quotation marks, brackets, and ellipsis omitted).

. Judge POOLER relies on a line of section 1983 cases explaining when and how private conduct can constitute state action, and then reasons by analogy to deem the defendants' conduct in this case to have arisen under foreign (Syrian) law. See Dissent of Judge Pooler at 627-28. Under this theory, Judge POOLER would allow a person tortured abroad to sue an official of the United States government, who in the performance of her official duties, “encourage[d],” "facilitated],” or "solicited]” the mistreatment. Id. at 629. Notably, she cites no authority for this remarkable proposition, which would render a U.S. official an official of a foreign government when she deals with that foreign state on matters involving intelligence, military, and diplomatic affairs. At least one commentator has proposed a legislative amendment to bring the law into line with what Judge *569 POOLER thinks it is, or should be. See Richard Henry Seamon, U.S. Torture as a Tort, 37 Rutgers L.J. 715, 802, 804 (2006) ("Under current law, U.S. officials can seldom be held civilly liable for torture.... Congress could amend the TVPA to extend the cause of action to the victims of torture inflicted under color of federal law.”).

. We need not, therefore, consider the panel’s holding that Arar failed "to establish that he possessed any entitlement to a pre-removal hearing” or "to the assistance of counsel.” Arar, 532 F.3d at 187-88.

. 8 U.S.C. § 1252(b)(9) provides that "(j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States ... shall be available only in judicial review of a final order.” Subsection 1252(a)(5), in turn, states that "a petition for review filed with an appropriate court of appeals ... shall be the sole and exclusive means for judicial review of an order of removal.” Finally, pursuant to § 1252(a)(2)(B):
[N]o court shall have jurisdiction to review
(ii) any ... decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified ... to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of [asylum].

. Accordingly, we have no occasion to consider the panel's conclusion that the “review procedures set forth by the INA provide a convincing reason for us to resist recognizing a Bivens cause of action for Arar's claims.” Arar, 532 F.3d at 180 (internal quotation marks and citation omitted).

. Judge Pooler labels these two principles "dicta,” see Dissent of Judge Pooler at 624, but they are not. They are integral to the holding in this in banc case, because we do not take account of countervailing factors and because we apply the standard we announce.

. See Press Release and Announcement, Stephen Harper, Prime Minister of Can. (Jan. 26, 2007), http://pm.gc.ca/eng/media.asp?id= 1510; Ottawa Reaches $10M Settlement with Arar, CBC News, Jan. 26, 2007, http://www. cbc.ca/canada/story/2007/01/25/arar-harper. html.

. See Ottawa Trying to Hold Back Documents from Arar Inquiry, CBC News, Apr. 29, 2004, htt p://www.cbc.ca/canada/stoiy/2004/04/29/ arar040429.html.

. We take judicial notice of the existence of this unclassified report and the scope of its contents, including the limited discussion of assurances. Notice is taken only that the report alleges that assurances were received, not as to the truth of that allegation or the reliability of those assurances.

. This risk is not necessarily abated by the undertakings of counsel. See, e.g., United States v. Sattar, 395 F.Supp.2d 79 (S.D.N.Y.2005) (denying attorney Lynne Stewart’s motion for a judgment of acquittal following her conviction by a jury of, inter alia, conspiring to defraud the United States, conspiring to provide material support to carry out murder and kidnap in a foreign country, and making false statements).

. Judge Calabresi does not discount the risk of graymail; he just minimizes the harm, equating it with settlement pressures that routinely inhere in section 1983 litigation. However, ''graymail'' is a term of art, signifying the use of military or intelligence information as hostage for payment of money or a plea bargain. The prospect of graymail does not induce Judge CALABRESI to pause because he sees graymail as part of the "judicial structures that facilitate the giving of compensation, at least to innocent victims....” See Dissent of Judge Calabresi at 638-39.

. It is telling that, according to the Deputy Assistant Attorney General, Mr. Arar and his attorney went to the United States Congress and requested — without success — that it "clarify the ambiguity [in this area] with legislation and ... give [Mr. Arar] reparations.” Transcript of Arar In banc Oral Argument at 49. Cf. 153 Cong. Rec. D1384-02 (Oct. 18, 2007); Matthew Jaffe, Congress Hears Testimony in Arar Torture Case, ABC News, Oct. 18, 2007, http://abcnews.go.com/Politics/ story?id=3746371 &page=l.

. Dissents by their nature express views that are not the law. These dissenting opinions contain words and passages that are emotional and (in our respectful view) overwrought. Accordingly, there is no need for extended engagement. A brief survey will suffice.
Judge Sack's dissent deems "artificial” our characterization of the new Bivens context in this case as "entirely one of 'international rendition, specifically extraordinary rendition.’ ” See Dissent of Judge Sack at 596. We would have thought it would be common ground that the context of this appeal is extraordinary rendition. Judge Sack, however, reconceives the context, at some points characterizing the constitutional tort as encompassing only those events that occurred within the United States while at other points requiring that the entire narrative be considered as a seamless whole, JFK to Syria. Compare id. at 594 with id. at 595-96. But this case is emphatically and obviously about extraordinary rendition (and its alleged abuse), as is elsewhere acknowledged in the opinions of Judge Calabresi and Judge Parker. See Dissent of Judge Calabresi at 638; Dissent of Judge Parker at 611.
As to the extraordinary rendition context, Judge Sack (joined by all dissenters) makes the following constructive (and telling) concessions: "It is difficult to deny the existence of 'special factors counseling hesitation’ in this case[,]” Dissent of Judge Sack at 601; "It ... may be that to the extent actions against 'policymakers’ can be equated with lawsuits against policies, they may not survive Iqbal [,]” id. at 602; and, “We share what we think to be the majority’s intuition that this case would likely turn largely, if not entirely, on decisions of national security and diplomacy ... [,]” id. at 605.
Judge Calabresi's dissent urges that we forgo considering whether specific factors counsel hesitation under Bivens so that we could instead remand to see whether the case might eventually be dismissed as unmanageable under the state secrets privilege — which Judge Calabresi seems equally to disapprove. See Dissent of Judge Calabresi at 637 (state secrets privilege is the subject of "significant criticism, much of it warranted”). Thus Judge Calabresi professes hesitance to "hesitate” with respect to Bivens, as well as skepticism of the state secrets privilege. In doing so, he avoids fully endorsing either of the primary potential resolutions of this appeal, and hardly makes a choice at all. Even so, the authority cited by Judge Calabresi, which suggests deciding whether a claim is stated before doing Bivens analysis, is inapposite. Judge Calabresi fails to consider that-application of the state secrets privilege is often performed witness-by-witness; question-by-question; page-by-page; paragraph-by-paragraph — and can take years. It is not judicial activism to hesitate before requiring such an exercise in circumstances in which a Bivens claim may not lie. In any event, the state secrets doctrine has roots in separation of *582 powers principles, and is not itself devoid of constitutional implications. See Dep’t of Navy v. Egan, 484 U.S. 518, 527, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988) ("The authority to protect [information related to national security] falls on the President as head of the Executive Branch and as Commander in Chief.”); El-Masri v. United States, 479 F.3d 296, 303 (4th Cir.2007) ("Although the state secrets privilege was developed at common law, it performs a function of constitutional significance, because it allows the executive branch to protect information whose secrecy is necessary to its military and foreign-affairs responsibilities.”).