MARCUS, Circuit Judge:
Santiago Alvarez, a Cuban national and longtime United States resident, was serving the last few weeks of a federal prison sentence when- United States Immigration and Customs Enforcement (“ICE”) lodged a detainer against him. Alvarez was ordered removed and, although ICE does not effectuate removals to Cuba, he remained in ICE custody from November 25, 2008 until October 21, 2009 — an amount of time greatly exceeding the 90-day -statutory period for removal. 8 U.S.C. *1196 § 1231(a)(1)(A). After Alvarez was released, he filed this Bivens action, arguing that various government officials, knowing that his removal order could not be executed, made false statements in order to unconstitutionally prolong his detention.
The district court dismissed his complaint in its entirety, first finding that it did not have subject matter jurisdiction over the claim pursuant to 8 U.S.C. § 1252(g) — which strips the federal courts of jurisdiction over claims “arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien.” The court also found that, even if jurisdiction was proper, several other grounds supported its dismissal. Among other things, the district court concluded that nó Bivens extension would be warranted to remedy an extensive immigration detention because an adequate, statutory remedial scheme ah’eady exists and several special factors counsel hesitation.
After thorough review, we affirm. Although we hold that § 1252(g) does not bar us from considering the merits of Alvarez’s claim, we also find that no Bivens remedy is available to him, both because the Immigration and Nationality Act sets out sufficient meaningful remedies for Alvarez and similarly situated aliens,, and because numerous special factors counsel against supplementing this scheme with, a new judicially created . cause of action. Notwithstanding having legislated, substantially and repeatedly in this area, Congress did not provide an. avenue by which Alvarez can seek monetary relief.- We defer to its judgement and hold that no Bivens remedy is available to a plaintiff who claims that- immigration officials unconstitutionally prolonged his detention.
I.
A.
The essential facts are these. Santiago Alvarez is a Cuban national who was admitted to' the United States as a lawful permanent resident in 1959. He lived primarily in Miami-Dade County, and he worked for the Central Intelligence Agency and the United States military between 1960 and 1968. Alvarez also has a criminal history -that dates back to-1990, when he was convicted of aggravated assault and battery with a gun after he assaulted a repossession agent who mistakenly > attempted to tow his vehicle. In November 2005, Alvarez was arrested and charged again, this time with possessing illegal weapons for the benefit of anti-Castro activists' outside of the United States. He subsequently pled guilty to federal weapons charges, - including, conspiracy to unlawfully possess machine guns and a grenade launcher.
Throughout the course of the plea negotiations, Alvarez’s attorneys voiced concerns that a guilty plea to federal weapons charges would affect his immigration status. The Department of Justice assured counsel that Cubans — particularly Cubans like Alvarez with" a documented history of opposing Castro’s" regime — are not deported to Cuba. The government agreed as a condition of the final plea agreement “to utilize its best efforts” to communicate with ICE officials and “to reach a definitive understanding of [Alvarez’s] immigration status and the effect of this case 'on his immigration status.”
Alvarez was initially sentenced to 46 months’ imprisonment, although his sentence was subsequently reduced to 30 months when he assisted -the government by arranging an anonymous turnover of various weapons. During the sentencing hearing, the judge described Alvarez and his co-defendants as “by all accounts ... *1197 compassionate, benevolent, and patriotic, not only to Cuba but to the United States.”
Alvarez served the first several months of his sentence in a federal prison, and he was due to be moved to a halfway house in November 2007 to serve the duration of his term. In August 2007, however, ICE lodged an immigration detainer against Alvarez with the Federal Bureau of Prisons. Alvarez filed a motion under 28 U.S.C. § 2255 in the Southern District of Florida, asking the court to lift the detainer, claiming that the government had breached the terms of his plea agreement by failing' to use its best efforts to reach a timely resolution of his immigration status.
A magistrate judge conducted a hearing on the motion and questioned ICE’s counsel, Assistant United States Attorney Robert Emery, about whether or not Alvarez’s deportation was a realistic possibility. The magistrate judge asked: “If in fact the Defendant can not [sic] be deported back to Cuba, why is it that you would keep him in custody for several months if there is no way he’s going to be able to be deported?” Emery responded, that the Immigration and Nationality Act allowed the government to deport Alvarez to a third country. The magistrate judge then inquired whether any Cuban national had ever been deported to a third country, and whether it was conceivable that any other country would accept Alvarez. Emery said that he did not know but that the court ought to allow ICE to take the full statutory 90-day period to investigate whether it would be possible to remove him. -The court commented, “maybe it is a collateral issue, but it does smack of unnecessarily punitive if at the end of the day you are going to cut him loose and you’re going to say, ‘well, there is no place we could deport him.’ ” Ultimately, however, the magistrate judge recommended that Alvarez’s motion be denied because Alvarez had sworn at his plea hearing that he understood'that his guilty plea could result in his deportation. Additionally, the judge pointed out that the decision to detail) or release Alvarez fell within ICE’s discretion. .The district court adopted the magistrate judge’s Report and Recommendations, and as a result, Alvarez remained in custody.
Sometime after the § 2255 hearing, Alvarez was' summoned to appear before a féderal grand jury in the Western District of Texas. The government sought Alvarez’s testimony that he had helped an individual illegally enter the United States. Alvarez refused to testify and was charged with obstruction of justice, in violation of 18 U.S.G. §§ 1503, 6002, and 6003. He pled guilty and was sentenced to an additional ten months in prison. As-a result of the new conviction and sentence, Alvarez was scheduled to be released from federal custody on November 25, 2008.
In the time leading up to Alvarez’s release date, his attorneys attempted to work with Emery to enter a stipulated final order of removal. Pursuant" to 8 U.S.C. § 1231(a)(1)(A), “when an alien is ordered removed, the Attorney General shall remove- the alien from the United States within a period of 90 days.” An alien can be ordered removed in two ways: (1) he can be ordered removed by an immigration judge (“IJ”) after a removal proceeding, see 8 U.S.C. § 1229a(a)-(e); or (2) ICE and the alien can stipulate that the alien is removable and the IJ'can enter a stipulated order that serves as “a conclusive determination of the alien’s removability,” id. § 1229a(d). Here, if ICE had agreed to stipulate that- Alvarez was- removable, the statutory period to remove him would have begun on or around his prison release date. Although it initially appeared that the parties had reached such an agreement, Emery withdrew the offer to stipulate' removability one week before Alvarez’s November 25 release *1198 date, and a removal hearing was scheduled for January 22, 2009. Thus, the statutory 90-day removal period did not , begin to run in this case until Alvarez had spent an additional two months in ICE custody.
After Alvarez was ordered removed at the hearing, his attorneys contacted Felicia Skinner, the Field Office Director of the Atlanta Office of Detention and Removal. They pointed out that Alvarez could not be removed to Cuba and requested that ICE expedite his review process. Skinner declined to expedite, review, and on the last day of the 90-day period, April 22, 2009, she issued a First Decision to Continue Detention. Skinner said that there was “no reason to believe that [Alvarez’s] removal will not take place within the reasonably foreseeable future.” She also found that Alvarez should be detained until that time because he was both a danger to his community and a flight risk. Skinner notified Alvarez that if he was not removed by July 21, 2009, jurisdiction over his removal would be “transferred to the Headquarters Case Management Unit.” No action was taken on Alvarez’s removal in the intervening period.
On July 28, 2009, Alvarez filed a petition for a writ of habeas corpus in the United States District Court for the Middle District of- Georgia, pursuant, to 28 U.S.C. § 2241. On September 17, 2009, ICE filed a motion for an extension of time. The motion, filed by Assistant United States Attorney Sheetul Wall, stated that the government was no longer seeking to remove Alvare,z to Cuba, but was actively pursuing his deportation to Spain. This application was accompanied by a declaration from Michael Gladish, an ICE Super-* visory Detention and Deportation officer, which left the impression that deportation to Spain was a realistic and foreseeable option because Alvarez was eligible for Spanish citizenship. In the affidavit,- Gladish claimed that, as a result of a “recent change” in Spanish law, foreign nationals with Spanish ancestors could apply for citizenship. Gladish affirmed that Alvarez’s paternal grandfather had been a national and citizen of Spain, Gladish also stated that Alvarez had been given, and promised to complete, an application for Spanish citizenship. The district court granted the extension, giving the government three more months to respond.
Alvarez moved for reconsideration of the district court’s order, arguing, among other things, that he was clearly ineligible for Spanish citizenship. In a sworn affidavit, Alvarez stated that ICE officials had given him two pages of a nine-page application for Spanish citizenship and asked him to fill them out. The missing application pages made, clear that the citizenship opportunity extended only to individuals whose ancestors had fled the Spanish Civil War, which took place between 1936 and 1939. Alvarez claimed that, when he learned this, he knew he was ineligible for citizenship because his grandfather had emigrated from Spain around 1875. He immediately informed a deportation officer — who is not named as a defendant — on September 14.
As a result of Alvarez’s motion, the district court rescinded the order and set the matter down for a hearing on October 26, 2009. After the hearing was set, Acting Headquarters Case Management Unit Chief Juan Munoz issued a Second Decision to Continue Detention on October 14, 2009. In it, Munoz acknowledged that although Alzarez’s removal to Cuba was not “presently possible,” ICE was working to secure his removal to Spain. .Munoz explained that there was no reason to believe that Alvarez’s removal would not occur in the reasonably foreseeable future. But on October 21, 2009 — approximately 11 months after Alvarez was first transferred to ICE custody — ICE officials notified him that he was being released. The govern *1199 ment then moved to dismiss his habeas proceeding as moot, but the court denied the motion. The district court held a hearing and found:
There is no dispute in the record that at all times all parties hereto knew that Petitioner Alvarez was not removable to Cuba, that there was no repatriation agreement between Cuba and the United States, and that Petitioner’s removal to Cuba would not be in the reasonably foreseeable future. Nonetheless, repeated requests that Petitioner Alvarez be released after January 22, 2009, were denied.
The court also found that by releasing Alvarez, “ICE had tacitly admitted ... that its [earlier] determination that Petitioner Alvarez was a threat to the community and a flight risk was no longer a valid determination” — and therefore that those grounds were “obviously no basis for illegal indefinite detention.” For these reasons, the district court retroactively granted Alvarez’s petition, effective October 21, 2009. The court also struck several conditions of Alvarez’s release as unconstitutional — although this Court reversed that determination in Alvarez v. Holder, 454 Fed.Appx. 769 (11th Cir.2011) (per curiam).[1] On appeal, the panel found that the district court had properly exercised jurisdiction over the petition because Alvarez was still technically in custody, facing a variety of release conditions, but it reinstated all of the conditions that the lower court had invalidated. Id.
B.
Alvarez subsequently commenced this lawsuit against various federal officials involved in continuing his detention in the United • States District Court . for the Southern District of Florida. He amended his complaint several months later, ultimately asserting Bivens claims against five defendants: (1) Robert Emery, the Assistant U.S.- Attorney who declined to lift Alvarez’s detainer or agree to a stipulated order of removal; (2) Felicia Skinner, the Field Office Director of the Atlanta Office of Detentioñ and Removal who issued the First Decision to Continue Detention; (3) Sheetul Wall, the Assistant U.S. Attorney who filed the motion for an extension of time to respond to Alvarez’s habeas.petition; (4) Michael Gladish, the ICE Supervisory Detention and Deportation officer whose declaration regarding Alvarez's eligibility for Spanish citizenship was attached to Wall’s -motion; and (5) Juan Munoz, the Acting Headquarters Case Management Unit Chief who issued the Second Decision to Continue Detention days before Alvarez was released. Alvarez brought claims for (1) “Conspiracy to prolong [his] release and to violate his fundamental right to freedom and liberty,” (Count I); (2) “Violation of [his] Fourth Amendment right against unreasonable seizure,” (Count II); and (3) ‘Violation of [his] Fifth Amendment right to due process and liberty,” (Count III).[2]
*1200 The individual defendants moved to dismiss the case for failure to state a claim, and the district court granted the motion, articulating various ground's for its decision. As we have noted, the court first found that it did not have subject matter jurisdiction over Alvarez’s claim as a result of the jurisdiction stripping provision contained in the Immigration and Nationality-Act, 8 U.S.C. § 1252(g). Next, it concluded that, in the alternative, the claims were barred by the two-year statute of limitar tions in Georgia-the state with the most significant relationship to the suit. It also found that the Supreme Court’s decision in Heck v. Humphrey, 512 U.S. 477, 487, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), barred the claims. The district court then concluded that no Bivens rerhedy should be recognized in this context because the Immigration and Nationality Act provides an adequate alternative remedy and several special factors counsel against extending Bivens into the immigration context. The trial court also determined that, even if it were to decide the case on the merits and find that the defendants had violated Alvarez’s constitutional rights, each official was entitled to qualified immunity because Alvarez had failed to sufficiently allege the violation of a clearly established right. Finally, as for two of the defendants, attorneys Emery and Wall, the court concluded that they were entitled to absolute immunity because their actions were intimately associated with the judicial process.
This timely appeal followed.
.,11.
We review the dismissal of a plaintiffs Bivens claim under Federal Rule of Civil Procedure 12(b)(6) and for lack of subject matter jurisdiction de novo. Lee v. Hughes, 145 F.3d 1272, 1274 (11th Cir.1998). We must aceept the factual allegations in the complaint as true and construe them- in the light most favorable to the plaintiff. Hardison v. Cohen, 375 F.3d 1262, 1263 (11th Cir.2004). We are free to affirm the district court’s dismissal on “any ground that is supported by the record.” United States v. Elmes, 532 F.3d 1138, 1142 (11th Cir.2008); see also Lee, 145 F.3d at 1277 n. 6 (“[T]he district court was incorrect to conclude that it lacked subject matter jurisdiction, but Was correct to dismiss for failure to state a claim. We therefore affirm the district court’s judgment.” (citation omitted)).
III.
This Court is obliged to address first whether we have jurisdiction to consider the merits of Alvarez’s claims. We have long recognized that “in the federal tandem, jurisdiction takes precedence over the merits. Unless and until jurisdiction is found, 'both appellate and trial courts should eschew substantive adjudication.” Belleri v. United States, 712 F.3d 543, 547 (11th Cir.2013) (alterations adopted) (quoting Opelika Nursing Home, Inc. v. Richardson, 448 F.2d 658, 667 (5th Cir.1971)); see also Univ. of S. Ala. v. Am. Tobacco Co., 168 F.3d 405, 410 (11th Cir.1999) (“A necessary corollary to the concept that a federal court is powerless to act without jurisdiction' is the equally unremarkable principle that a court'should inquire into whether it has subject matter jurisdiction at the earliest possible stage in the proceedings.”). “The jurisdiction of a court over the subject matter of'a claim involves *1201 the court’s competency to consider a given type of case,” and to allow parties to obtain adjudications on the merits where subject matter jurisdiction does not exist would “‘work a wrongful extension of federal jurisdiction and give [federal] courts power the Congress denied them.’ ” Jackson v. Seaboard Coast Line R.R. Co., 678 F.2d 992, 1000 (11th Cir.1982). (quoting Am. Fire & Cas. Co. v. Finn, 341 U.S. 6, 18, 71 S.Ct. 534, 95 L.Ed. 702 (1950)). In short, if Congress has stripped us of jurisdiction over Alvarez’s claims, then our inquiry is at an end.
The district court concluded that it lacked jurisdiction over Alvarez’s Bivens claims pursuant to 8 U.S.C. § 1252(g), which provides:
Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision, and sections 1361 and‘1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence 'proceedings, adjudicate cases, or execute removal orders- against any alien-under this chapter.
Id: (emphásis added). The difficulty in interpreting this provision is that “Congress- has provided no explicit definition of the phrase ‘arising from,’ and courts have not always agreed on its plain meaning.” Humphries v. Various Fed. USINS Emps., 164 F.3d 936, 943 (5th Cir.1999). Congress also has not defined “commence proceedings,” “adjudicate cases,” or “execute removal orders.” We begin with first principles: for ICE “to prevail [on jurisdictional grounds] it must overcome ... the strong presumption in favor of judicial review of administrative action.” INS v. St. Cyr, 533 U.S. 289, 298, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). Indeed, the Supreme Court has long cautioned “that whére Congress ínténds to preclude judicial review of constitutional claims its intent to do so must be clear.” Webster v. Doe, 486 U.S. 592, 603, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988); accord Demore v. Kim, 538 U.S. 510, 517, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003); see also Johnson v. Robison, 415 U.S. 361, 373-74, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974) (“[Njeither the text nor the scant legislative history of [the provision] provides the ‘clear and convincing’ evidence of congressional intent required by this Court -before a statute will be construed to restrict access to judicial review.”).
Moreover, the Supreme Courts decision in Reno v. American-Arab Anti-Discrimination Committee (AADC), 525 U.S. 471, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999), further counsels in favor of reading § 1252(g) narrowly. In American-Arab Anti-Discrimination Committee, the petitioners were resident aliens ordered removed on the basis of routine immigration violations under circumstances that suggested they had been targeted for removal on account of their membership in a group advocating the creation of an independent Palestinian state. See id. at 473-74, 119 S.Ct. 936. They brought a selective enforcement claim against the Immigration and Naturalization Service (“INS”), and the Supreme Court considered whether § 1252(g) barred the federal courts from reaching the merits of the group’s claim. Id at 473-76, 119 S.Ct. 936.
Although the parties assumed that § 1252(g) applied to “all or nearly all deportation claims,” the Supreme Court rejected this interpretation. Id. at 478, 119 S.Ct. 936. The provision, the Court observed, does not say “no judicial review in deportation cases unless this section provides judicial review.” Id. at 482, 119 S.Ct. 936. Rather, it is drawn in a “much *1202 narrower” way and “applies :only to three discrete actions,” namely, the “ ‘decision or action’ to ‘commence proceedings, adjudicate cases, or execute removal .orders.’ ” Id. (quoting 8 U.S.C. § 1252(g)). Thus, for example, the provision has no effect on a variety of other actions that may be taken before,, during, and after removal proceedings — “such as the decisions to open an investigation, to surveil the suspected violator, to reschedule the deportation hearing, to include various provisions’ in the final order that is the product of the adjudication; and to refuse reconsideration of that order.” Id.
The Court also emphasized, however, that “[tjhere was good reason for Congress to focus special attention upon, and make special provision for, -judicial review of the- Attorney General’s discrete acts of commencing' proceedings, adjudicating cases, and executing removal orders.” Id. at 483, 119 S.Ct. 936 (alterations adopted) (internal quotation marks and citation omitted). These three actions “represent the initiation or prosecution .of various stages in the deportation process,” and “[a]t each stage the Executive has discretion to abandon the endeavor” for any number of reasons. Id. The Court noted that the agency’s discretionary termination of the removal process for certain aliens had inadvertently “opened the door to litigation in instances where the INS chose not to exercise.it.” Id. at 484, 119 S.Ct. 936. Thus, § 1252(g) “seems clearly designed to give some measure of protection to ‘no deferred action’ decisions and similar discretionary determinations.” Id. at. 485, 119 S.Ct. 936. It further described the provision as “specifically directed at the deconstruction, fragmentation, and hence prolongation of removal proceedings.” Id. at 487, 119 S.Ct. 936. Applying these principles to the petitioners’ selective enforcement claims, the Supreme Court dismissed their suit — concluding that, at bottom, the claims amounted to a challenge to.the Executive branch’s decision to commence proceedings. Id.
Although American-Arab Anti-Discrimination Committee does not answer ■the question of whether we have jurisdiction over Alvarez’s claim, it does guide our inquiry. Notably, it instructs us to narrowly interpret § 1252(g) — a command that our' sister circuits have applied in subsequent cases. Thus, for example, the Seventh Circuit has explained that the provision only includes within its scope those challenges that ask the district court, and ultimately the court of appeals, “to block a decision ‘to commence proceedings, adjudicate cases, or execute removal orders.’” Parra v. Perryman, 172 F.3d 954, 957 (7th Cir.1999) (quoting 8 U.S.C. § 1252(g)). In its view, § 1252(g) is no impediment to adjudicating claims that challenge “detention while the administrative process lasts.” Id.; accord Carrera-Valdez v. Perryman, 211 F.3d 1046, 1047 (7th Cir.2000) (“Carrera did not ask the district court to block the commencement or adjudication of a case, nor did he protest the execution of a removal order — Carrera wants review of his placement pending his transfer to another nation, and nothing in § 1252(g) precludes review of the decision to confine Carrera until then.”); see also Zhislin v. Reno, 195 F.3d 810, 814 (6th Cir.1999) (“Zhislin ... challenges neither the constitutionality of the deportation order nor the right of the Attorney General to execute the order. All that [he] is challenging is the right of the Attorney General to detain him indefinitely— ”). The Third Circuit has taken a different approach- — although significantly, for our purposes, also a narrow one — rholding that the provision “only applies to suits challenging the government’s selective enforcement of the immigration laws.” DeSousa v. Reno, 190 F.3d 175, 182 (3d Cir.1999); see Mirmehdi v. United States, 689 F.3d 975, 983 n. 4 (9th Cir.2012) (explaining that “ ‘an alien unlaw *1203 fully in this country has no constitutional right to assert [a claim of] selective enforcement’ of immigration laws” (quoting AADC, 525 U.S. at 488, 119 S.Ct. 936)).
The district court concluded that Alvarez’s complaint contained two kinds of allegations — those that arose from the decision to initiate his removal proceedings, and others that arose from the execution of his removal order. First, it found that any challenge to ICE’s decision to require Alvarez to attend removal proceedings— rather than agreeing to a stipulated order — fell squarely within the scope of § 1252(g). We agree with this determination. The challenge to ICE’s decision, made by its counsel, Defendant. Emery, essentially asks this Qourt to find that the agency should have chosen a different method of commencing proceedings. The district court was correct to find that § 1252(g) strips us of the power to entertain such a claim. By its plain terms, the provision bars us from questioning ICE’s discretionary decisions to commence removal — and thus necessarily prevents us from considering whether the agency should have used a different statutory procedure to initiate the removal process.
Next, the district court addressed Alvarez’s challenges to ICE’s; decision to take him into custody and to detain him during his removal proceedings — concluding that they also were closely connected to the decision to commence proceedings, and thus were . immune from. our. review. Again, the district court was correct. Looking to the specific factual allegations in the complaint, Alvarez alleges, among other claims, that (1) ICE failed to honor the “best efforts” commitment in his plea bargain and reach a timely determination of his immigration status;[3] and (2) during the hearing in federal court on Alvarez’s § 2255 motion to lift his detainer, Defendant Emery knowingly misrepresented that he was unaware of whether a Cuban national with Alvarez’s background had ever been removed to a third country. These ■ allegations similarly arise frpm ICE’s decision to commence proceedings. Although the first allegation uses the term “best efforts” and references Alvarez’s plea bargain,, at its core it challenges ICE’s decision to lodge a detainer against him. .Accordingly, both allegations challenge the propriety of ICE’s decision to detain Alvarez prior to his removal hearing.
As a panel of this Court explained in Gupta v. McGahey, “securing an alien while awaiting [his removal hearing] constitutes an action taken to commence proceedings.” 709 F.3d 1062, 1065 (11th Cir.), suggestion for reh’g en banc denied, 737 F.3d 694 (2013), cert. denied, — U.S. —, 134 S.Ct. 2840, 189 L.Ed.2d 806 (2014), In Gupta, a removable alien argued that federal agents “illegally procured an arrest warrant, that the agents *1204 illegally arrested him, and that the agents illegally detained him,” Id. We found that § 1252(g) barred us' from reaching ■ the merits of these claims — which we said arose from the decision to commence proceedings. Id. at 1065-66. Here, Alvarez similarly argues that he was detained by means of misrepresentations and disregard for the Department of Justice’s - commitment in his plea agreement. Because Alvarez challenges the methods that ICE used to detain him prior to his removal hearing, these claims .are foreclosed by § 1252(g) and our decision in Gupta.
Finally, the district court concluded'that all of ICE’s actions' taken after Alvarez was ordered removed on January 22, 2009,-also fell within the scope of § 1252(g)’s jurisdictional bar because they arose from the decision to execute his removal order. The court observed that “ICE has the .:. authority to detain an alien' who has been ordered removed if he is determined ‘to be a risk to the community or unlikely to comply with the order of removal.’ ” See 8 U.S.C. § 1231(a)(6). It then found that all of Alvarez’s challenges to ICE’s post-removal actions constituted challenges to this discretionary determination. The court ultimately found that although Alvarez “dispute[d] that he posed any risk to the community, that determination is exactly the type of action that arises from ICE’s discretionary authority to execute a removal order.”
We part ways with the district court here. Alvarez claims that the defendants took-various steps in order to prolong-his detention after the statutory 90-day period that ICE was afforded to execute his removal, which began on January 22, 20,09. First, on April 22, 2009, Defendant Skinner issued the “First Decision to Continue Detention’) — which allegedly falsely stated that Alvarez’s removal would take place in the “reasonably foreseeable future” and that he would not be released in the meantime' on the grounds that he was a flight risk and posed a danger to the community. Second, on October 14, 2009, Defendant Munoz issued the “Second Decision to Continue Detention” which made the same alleged misstatements and added that Alvarez was eligible for Spanish citizenship. Moreover, Defendant Wall filed a motion in support of a continuance in Alvarez’s habeas proceedings, despite allegedly knowing that Alvarez was not in fact eligible for Spanish citizenship. Finally, Defendant- Gladish submitted an affidavit, which was attached to Wall’s motion, stating that Alvarez' would be removed to Spain in the reasonably foreseeable future because he was eligible for Spanish citizenship, despité allegedly knowing-that this was untrue. These habeas actions also occurred months after the statutory removal périod had lapsed — indeed, the 90-day removal period ended' on April 22, 2009 and Alvarez did not file his petition for a writ of habeas corpus until July 28, 2009.
As we see it, no matter how broadly we define the term “execute a removal order,” we would still be compelled to find that these actions, if accurately portrayed in the complaint, do not “arise from” such a decision. Indeed, Alvarez alleged that no decision to execute his removal orders was ever reached. He repeatedly alleged that the named officials knew that he could not be removed — to Cuba, Spain, or any other country and never intended to remove him.
Alvarez’s ■ complaint alleges, then, that each action taken by the defendants after the statutory 90-day period was motivated by the singular intent to prolong his detention, not to. execute his removal. If, as Alvarez claims, the defendants knew that it would be impossible to execute his removal order at 90-days, at six months, or afterward — when they issued the two Decisions to Continue Detention and opposed *1205 his habeas petition — then these acts cannot be said to have arisen from a'decision to remove him. Quite simply, a claim that arises from the decision to. indefinitely detain an alien — and thus, by definition, never to remove him — cannot arise from the decision to execute removal.
Our interpretation is consonant with the Supreme Court’s instructions to read § 1252(g) as a narrow provision. See AADC, 525 U.S. at 482, 119 S.Ct. 936; see also Humphries, 164 F.3d at 943 (“As a general matter, ‘arising from’ does seem to describe a nexus somewhat more tight than the also frequently used phrase ‘related to.’”). It is also consistent with the dual purposes of the provision that the Supreme Court identified. America,n-Arab Anti-Discrimination Committee establishes that § 1252(g) is “designed to give some measure of protection to ‘no deferred action’ decisions and similar discretionary determinations, providing that if they are reviewable at all, they at least will not be made the bases for separate rounds of judicial intervention outside the streamlined process that Congress has designed.” 525 U.S. at 485, 119 S.Ct. 936. This means that we should apply it to preclude “[ejfforts to challenge the refusal to exercise [favorable] discretion on behalf of specific aliens,” id. (quoting C. Gordon, S. Mailman, & S. Yale-Loehr, Immigration Law and Procedure § 72.03[2][a]), as well as those claims that would lead to “the deconstruction, fragmentation, and hence prolongation of removal proceedings,” id. at 487, 119 S.Ct. 936.
Alvarez’s case presents neither situation. Alvarez does not allege that ICE should have exercised its discretion arid released him. Rather, he claims that after the initial 90-day removal period, the agency had no statutory grounds on which to’detain him because his removal was not reasonably foreseeable. See Zadvydas v. Davis, 533 U.S. 678, 699-700, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) (“[I]f'removal is not reasonably foreseeable, the court should hold continued detention unreasonable and no longer authorized by statute.”). Moreover, there is no danger that' our exercise of jurisdiction will lead to the -“deconstruction” or “fragmentation” of removal proceedings — Alvarez’s removal has already been fully adjudicated, and ÍCE has already released him from custody. Thüs, we hold that § 1252(g) does not strip us of jurisdiction.
/ IV.
We come -then to the central merits question — whether we should expand the judicially crafted Bivens cause of action to cover these claims- against Defendants Emery, Skinner, Munoz, Wall, and Gladish. We agree with the district court and hold that no Bivens remedy is available. We affirm on this basis, and thus do not decide whether any of its, other -rationales would be sufficient to support the dismissal.
. In Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the Supreme Court for the first time recognized an implied private action for damages against federal officers alleged to have violated a citizen’s Fourth Amendment rights while acting in their official capacities. The Supreme Court subsequently held that its decision in Bivens also allows plaintiffs to bring claims for damages -when federal officials engage in certain conduct that violates the Fifth and Eighth Amendments, finding that in these contexts a complete absence of alternative remedies required the recognition of an implied cause of action. Walden v. Centers for Disease Control & Prevention, 669 F.3d 1277, 1284 n. 3 (11th Cir.2012) (citing Carlson v. Green, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980); Davis v. *1206 Passman, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979)). Notably, however, the Court has not extended Bivens into a new context since 1980. Id.; Corr. Servs. Corp. v. Malesko, 584 U.S. 61, 70, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001) (“In 30 years of Bivens jurisprudence we have extended its holding only twice, to provide an otherwise nonexistent cause of action against individual officers alleged to have acted unconstitutionally, or to provide a cause of action for a plaintiff who lacked any alternative remedy for harms caused by an individual officer’s unconstitutional conduct.” (emphases omitted)); De La Paz v. Coy, 786 F.3d 367, 372 (5th Cir.2015) (“The Court has not created a new Bivens remedy in the last thirty-five years, although ‘it has reversed more than a dozen appellate decisions that had created new actions for damages.’ ” (quoting Vance v. Rumsfeld, 701 F.3d 193, 198 (7th Cir.2012) (en banc))).
In analyzing whether to recognize a Bivens remedy in a new context, we engage in a two-step inquiry. “In the first place,” we ask “whether any alternative, existing process for protecting the constitutionally recognized interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages.” Minneci v. Pollard, — U.S. -, 132 S.Ct. 617, 621, 181 L.Ed.2d 606 (2012) (alterations adopted) (quoting Wilkie v. Robbins, 551 U.S. 537, 550, 127 S.Ct. 2588, 168 L.Ed.2d 389 (2007)). If we find that existing process is sufficiently protective, we do not recognize á Bivens remedy. The alternatives need not “provide complete relief for the plaintiff,” Schweiker v. Chilicky, 487 U.S. 412, 423, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988) (quoting Bush v. Lucas, 462 U.S. 367, 388, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983)), and as long as Congress has established an “elaborate, comprehensive scheme” governing a particular type of claim, this Court will not allow a Bivens remedy to supplement that system, id. at 436, 108 S.Ct. 2460 (quoting Bush, 462 U.S. at 385, 103 S.Ct. 2404). As the Supreme Court has put it, “The question is not what remedy the court should provide for a wrong that would otherwise go unredressed. It is whether an elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations, - should be augmented by the creation of a new judicial remedy for the constitutional violation at issue.” Bush, 462 U.S. at 388, 103 S.Ct. 2404.
But even in the absence of an adequate alternative, “a Bivens remedy is a subject of judgment,” Minneci, 132 S.Ct. at 621 (internal quotation marks and citations omitted), and we “must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counseling hesitation before authorizing a new kind of federal litigation,” Bush, 462 U.S. at 378, 103 S.Ct. 2404. The Supreme Court has “repeatedly said that a decision to create a private right of action is one better left to legislative judgment in the great majority of cases.” Sosa v. Alvarez-Machain, 542 U.S. 692, 727, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). Accordingly, the federal courts have resisted extending the availability of Bivens remedies in new contexts on the basis of numerous special factors, including “military concerns, separation of powers, the comprehensiveness of available statutory schemes, national security concerns, and foreign policy considerations.” Arar v. Ashcroft, 585 F.3d 559, 573 (2d Cir.2009) (en banc) (citations omitted).
Although we have never explicitly considered whether to imply a Bivens remedy in the immigration context, two of our sister circuits have counseled against it, concluding both that the Immigration and *1207 Nationality .Act provides an adequate alternative remedy and that, even if it didn’t, special factors counsel in favor of hesitation.[4] First, in Mirmehdi v. United States, the Ninth Circuit considered a pet of facts similar to the ones we currently face. 689 F.3d 975 (9th Cir.2011). The plaintiffs were arrested for minor immigration violations, and released on bond. Id. at 979. The following, year, however, federal officials sought to have their bond revoked because their names appeared on a handwritten document that the officials claimed was a membership list recovered from the headquarters of a known terrorist group. Id. The plaintiffs were then detained pending the resolution of their removal proceedings for nearly four years. Id. They brought suit alleging that two federal agents knowingly lied about their involvement in the organization in order to induce the immigration judge to revoke their bond, and -they asked the court' to recognize a remedy under Bivens. Id. at 979-80.
The Ninth Circuit held that it would be inappropriate to imply a Bivens remedy in this context. Looking first to the availability of alternative remedies, it noted that “Congress has established a substantial, comprehensive, and intricate remedial scheme in the context of immigration,” and that the availability of. a writ of habeas corpus provides additional protection. Id. at 982 (quoting Arar, 585 F.3d at 572). The court next decided, in the alternative, that-at-least two special factors weighed against recognizing a Bivens remedy. First, “[t]he complexity and comprehensiveness of the existing remedial system,” suggested that no judicial intervention was warranted. - Id. - Second, “immigration issues ‘have the natural tendency to affect diplomacy, foreign policy, and the security of the nation,’ ” which counseled hesitation. Id. (quoting Arar, 585 F.3d at 574).
The Fifth Circuit recently reached the same conclusion in De La Paz v. Coy, 786 F.3d 367 (5th Cir.2015), and held that Bivens does-not extend to. “claims arising from civil immigration apprehensions and detentions, other than those alleging unconstitutionally excessive force.”[5] Id. at 375, In De La Paz, the court undertook the same two-step inquiry, first determining that judicial recognition of a new remedy was unnecessary because the existing “federal governance of immigration and alien status is extensive and complex.” Id. (alteration adopted) (quoting Arizona v. United States, — U.S. -, 132 S.Ct. 2492, 2499, 183 L.Ed.2d 351 (2012)). The court then found that, even if the INA did *1208 not provide an adequate remedy, numerous “special factors unique to the immigration context” counseled against an extension. Id. at 378. Among other things, the court found.that federal agents may be deterred “from vigorous enforcement and investigation of illegal immigration,” id. at 379, and that extending Bivens suits to the immigration context could lead to a substantial influx in litigation, id at 379-80. Moreover, “immigration policy and enforcement implicate serious separation of powers concerns.” Id at 379.
We too hold that a plaintiff cannot recover damages under Bivens for constitutional -violations that caused him to endure a prolonged immigration detention.[6] The Immigration and Nationality Act- is “an elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations.” Bush, 462 U.S. at 388, 103 S.Ct. 2404. Indeed, Congress has provided fdr a host of review procedures tailored to the differently situated groups of aliens that may be-present in the United States. The Act sets out numerous avenues for aliens to obtain review of ICE decisions by an immigration judge or federal court, as well as opportunities for aliens to seek discretionary relief. See 8 U.S.C. § 1225(a)(2), (b)(1)(A)(ii), (b)(1)(B)(iii)(III) (providing that aliens treated as applicants for admission and stowaways may apply for asylum and are entitled to “prompt review by an immigration judge” if they are found ineligible); id. § 1228(c) (providing procedures for an alien convicted of an aggravated felony to be immediately ordered removed by a federal district court-and granting both parties the right to appeal the court’s decision); id. § 1229a(a)(1) (providing that an immigration judge shall decide the in-adinissibility or deportability of an alien); id. § 1229a(c)(7) (providing that an alien may file one motion to reopen his removal proceedings on the basis of newly discovered facts); id. § 1229b(a)-(b) (giving' the Attorney General discretion to cancel the removal of aliens, resident aliens, and victims of violence who meet enumerated criteria); 8 C.F.R. § 241.4(k)(2)(iii) (requiring that, when an alien is detained for longer than 90 days, he be permitted to request his release every three months and that he receive review, from the Headquarters Post-Order Detention Unit).
Additionally, the Supreme Court has made it abundantly clear that a detained alien can seek a petition for a writ of habeas corpus to challenge his detention in the .event that the statute’s review procedures are insufficiently protective. See Zadvydas, 533 U.S. at 688, 121 S.Ct. 2491 (“We conclude that § 2241 habeas corpus proceedings remain available as a forum for statutory and constitutional challenges to post-removal-period detention.”); accord St. Cyr, 533 U.S. at 314, 121 S.Ct. 2271. The dissent discounts the significance of possible habeas relief. But we can discern no reason to exclude the option *1209 of seeking habeas relief from our consideration. Surely Congress was aware of the habeas rules it had crafted in 28 U.S.C. § 2241 when it repeatedly legislated in the area of immigration law. Moreover, we have previously held that the availability of habeas relief when paired with a detailed regulatory scheme constitutes a special factor, counseling against recognizing a new Bivens cause of action. Rauschenberg v. Williamson, 785 F.2d 985, 987-88 (11th Cir.1986). In fact, habeas corpus provides a litigant like Alvarez with the most speedy, direct, and powerful remedy from wrongful detention. See Ex parte Yerger, 75 U.S. 85, 95, 8 Wall. 85, 19 L.Ed. 332 (1868) (“The great writ of habeas corpus has been for centuries esteemed the best and only sufficient defence of personal freedom.”); accord Boumediene v. Bush, 553 U.S. 723, 739, 128 S.Ct. 2229, 171 L.Ed.2d 41, (2008) (“The Framers viewed freedom from unlawful restraint as a fundamental precept of liberty, and they understood the writ of habeas corpus as a vital instrument to secure that freedom”). In sharp contrast, monetary compensation would afford, at best, an incompleté, secondary, and substantially delayed remedy for a detention based on false claims made by a government agent.
Analysis of the statutory scheme also confirms the conclusion-that the congressional decision not to provide a private action for damages was deliberate. See De La Paz, 786 F.3d at 377-78; Mirmehdi 689 F.3d at 982. Indeed, Congress has amended the Immigration and Nationality Act on no less than seven -occasions. See, e.g., REAL ID Act of 2005, Pub.L. No. 109-13, 119 Stat. 302 (2005); Illegal Immigration Reform and Responsibility Act of 1996, Pub.L. No. 104-208, 110 Stat. 3009 (1996); Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214 (1996); Immigration Act of 1990, Pub.L. No. 101-649, 104 Stat. 4978 (1990); Immigration Reform and Control Act of 1986, Pub.L. No. 99-603, 100 Stat. 3359 (1986); Immigration and Nationality Act Amendments of 1976, Pub.L.- No.- 94-571* 90 Stat. 2703 (1976); Immigration and Nationality Act Amendments of 1965, Pub.L. No. 89-236, 79 Stat. 911 (1965). In light-of the frequent attention that the legislature has ' given to the' complex scheme governing removal and its review procedures over many years, we are satisfied that Congress has weighed the policy considerations in favor of and against providing damages. See Schweiker, 487 U.S. at'425-26, 108 S.Ct. 2460 (explaining that because “[c]ongressional attention ... has ... been frequent and intense” and “[a]t each step, Congress chose specific forms and levels of protection for the rights of persons affected” it was clear that the failure to provide for damages was intentional).
Thus,' the complexity of the Immigration and Nationality Act, and Congress’s frequent amendments to it, suggest that no Bivens remedy is warranted. We also note that Alvarez has not “alleged that he was actively prevented from seeking any meaningful review, and relief through the INA processes.” See Arar, 585 F.3d at 573 (emphasis added). In fact, Alvarez availed himself of the Act’s review mechanisms many different times during his detention. He first sought relief under 28 U.S.C. § 2255, arguing that the magistrate judge should lift his ICE detainer.. Next, he appeared before an immigration judge for a hearing — where he had the opportunity to apply for relief or protection from removal, or to contest his removability. See 8 U.S.C. § 1229a(a)(1). After he was ordered removed, he sought discretionary relief from Defendant Felicia Skinner, and asked her to expedite review of his ease during the statutory removal period. He ■also received two custody determinations by ICE — though in each instance the agency found sufficient grounds to contin *1210 ue detaining him, as Skinner and Munoz explained in their Decisions to Continue Detention. Finally, Alvarez filed a petition for a writ of habehs. corpus in the United States District Court for the Middle District of Georgia, pursuant to 28 U.S.C § 2241, alleging that his detention was unconstitutional. In short, he is in no position to argue that the elaborate scheme that Congress designed afforded him no opportunity for a meaningful remedy. See Schweiker, 487 U.S. at 425, 108 S.Ct. 2460 (“Congress ... has not failed to provide meaningful safeguards or remedies for the rights of persons situated as respondents were.”).
Moreover, even if we were to conclude that no sufficient alternative remedy exists, we would still find that numerous special factors counsel hesitation in this context. For starters, the breadth and detail of the Immigration and Nationality Act itself counsels in favor of hesitation. Mirmehdi, 689 F.3d at 982. As the Supreme Court has explicitly cautioned, “[w]hen the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration,” this constitutes a “special factor[] counseling hesitation.” Schweiker, 487 U.S. at 423, 108 S.Ct. 2460. Another special factor is the importance of demonstrating due respect for the Constitution’s separation of powers. As the Fifth Circuit explained, “[t]he Constitution gives Congress the power to ‘éstablish a uniform Rule of Naturalization,’ ” De La Paz, 786 F.3d at 379 (quoting U.S. Const., art. I, § 8, cl. 4), and the Executive possesses “inherent powér as sovereign to control and conduct relations with foreign nations,” id. (quoting Arizona, 132 S.Ct. at 2498); see also Arar, 585 F.3d at 575 (“The Supreme Court has expressly counseled that matters touching upon foreign policy and national security fall within ‘an area of executive action in which courts have long been hesitant to intrude’ absent congressional authorization.” (quoting Lincoln v. Vigil, 508 U.S. 182, 192, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993))). This “gives the political branches of the federal government ‘broad, undoubted power over the subject of immigration.’ ” De La Paz, 786 F.3d at 379 (quoting Arizona, 132 S.Ct. at 2498). These branches are generally better “situated to consider sensitive foreign policy issues” that immigration cases may implicate, and involvement of the courts into their domain can in some instances “undermine the Government’s ability to speak with one voice in this area.” Munaf v. Geren, 553 U.S. 674, 702, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008); see also Mirmehdi 689 F.3d at 982-83 (noting that “immigration issues ‘have the natural tendency to affect diplomacy, foreign policy, and the security of the nation,’ ” and may involve “the disclosure of foreign-policy objectives” (quoting Arar, 585 F.3d at 574, and AADC, 525 U.S. at 490, 119 S.Ct. 936)). In short, “[l]ack of institutional competence as well as a lack of constitutional authority counsel ... hesitation by the judiciary in fostering litigation of this sort.” De La Paz, 786 F.3d at 379.
Finally,- Alvarez’s allegations implicate one additional special factor counseling hesitation — namely the claim he asks us to recognize would be doctrinally novel and difficult to administer. See Hernandez v. United States, 757 F.3d 249, 275 (5th Cir.), reh’g en banc granted, 771 F.3d 818 (2014), adhered, to in part on reh’g en banc, 785 F.3d 117 (2015) (“Another species of special factor is the workability of the cause of action.”).. - Alvarez’s claims do not involve “questions of precisely Bivens-like domestic law enforcement and nothing more.” Id. at 276, Rather, Alvarez asks us to examine ICE’s motivations for continuing not only his own detention, but that of every other alien who may be detained *1211 past the statutory 90-day period. The agency’s discretion to abandon removal proceedings for humanitarian or efficiency reasons, see AADC, 525 U.S. at 483-84, 119 S.Ct. 936, would make it particularly difficult for us to undertake this kind of inquiry. As a result, to decide each claim, we would need to consider, among other things, the likelihood of effecting removal, “the [removal’s] general deterrence value, the Government’s enforcement priorities, and the case’s relationship to the Government’s ■ overall enforcement plan,” and weigh these against the alien’s allegations of deceit. Id. at 490, 119 S.Ct. 936 (quoting Wayte v. United States, 470 U.S. 598, 607, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985)). In other words, the claim Alvarez asks us to recognize is not generally susceptible to the kind of analysis the courts are competent to undertake. See id.
Moreover, it is difficult to conceive that any alien would forgo making such an argument in our Court if we were to recognize the availability of a Bivens remedy for this type of conduct. The lack of a clearly defined standard by which to judge such claims, and the nature of the claim as based primarily on the credibility 6f each party, would likely lead to widespread litigation. And we cannot ignore that this' volume of litigation could chill ICE officials from engaging in robust enforcement of this country’s immigration laws. As the Fifth Circuit explained, “Faced with a threat to his checkbook from suits based on evolving and uncertain law, the officer may too readily shirk his duty.” De La Paz, 786 F.3d at 379; see also AADC, 525 U.S. at 490, 119 S.Ct. 936 (“ ‘Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor’s motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government’s enforcement, policy.’ ... These concerns are greatly magnified in the deportation context.” (quoting Wayte, 470 U.S. at 607, 105 S.Ct. 1524)). While we acknowledge that. ICE officials may act wrongly in detaining certain aliens — and may even in some- instances violate the Constitution — we cannot agree with Alvarez that recognizing a Bivens remedy would be a prudent way to address this possibility. See Wilkie, 551 U.S. at 561, 127 S.Ct. 2588 (“The point here- is not to deny that Government employees sometimes overreach, for of course they do, and they may have done so here if all the allegations are true. The point is the reasonable fear that a general Bivens cure would be worse than the disease.”).
Alvarez argues nevertheless that the Immigration and Nationality Act does not serve as an adequate existing remedy because it does not provide him with an avenue to seek damages. However, the Supreme Court ■ has made it clear that Congress’s failure to provide monetary relief is not dispositive. See Malesko, 534 U.S. at 69, 122 S.Ct. 515 (“So long as the plaintiff had an avenue for some redress, bedrock principles of separation of powers foreclose[] judicial imposition of a new substantive liability.”); Schweiker, 487 U.S. at 421-22, 108 S.Ct. 2460 (“The absence of statutory relief for a constitutional violation, for example, does not by any means necessarily imply that courts should award money damages against the officers responsible for the violation.”); cf. Minneci, 132 S.Ct. at 625 (“[S]tate tort law may sometimes prove less generous than would a Bivens action.... But we cannot find in this fact sufficient basis to determine state law inadequate.”).
This Court, and our sister circuits, have also repeatedly said that we will defer to Congress’s decision not to award damages for a particular violation, particularly in the face of a. carefully, crafted remedial scheme. See Lee, 145 F.3d at 1276-77 *1212 (declining to find a Bivens remedy because “there was no inadvertence by Congress in omitting a damages remedy” in a statutory scheme); Miller v. U.S. Dep’t of Agr. Farm Servs. Agency, 143 F.3d 1413, 1415 (11th Cir.1998) (“Congress is in a better position than the courts to weigh the competing policy imperatives involved in the creation of remedies — ”); De La Paz, 786 F.3d at 377 (“[The plaintiffs] argue that the INA fails adequately to protect their Fourth Amendment interests because it does not provide a damages remedy against individual agents. This is a misreading of the case law. The INA need not provide an exact equivalent to Bivens.”), Engel v. Buchan, 710 F.3d 698, 704 (7th Cir.2013) (“[T]he Court has explained that the existence of a comprehensive, alternative remedial scheme may preclude a Bivens remedy even where the alternative relief is imperfect compared to Bivens and Congress ■ has not explicitly declared it to be a substitute.”); Mirmehdi, 689 F.3d at 982 (“Indeed, so long as Congress’ failure to provide money damages has not been inadvertent, courts, should defer to its judgment.” (internal quotation marks omitted and alterations adopted)); Arar, 585 F.3d at 573 (“In light of the complexity of the remedial scheme Congress has created (and frequently amended), we would ordinarily draw a strong inference that Congress .intended the judiciary to stay its hand and refrain from creating a Bivens action in this context.”).
Alvarez also suggests that our decision in Abella v. Rubino, 63 F.3d 1063 (11th Cir.1995) (per curiam), counsels in favor of recognizing a Bivens remedy in this context. We disagree. In Abella, the plaintiff, a federal prisoner, filed a Bivens action against “two federal district judges, an assistant U'.S. Attorney, U.S. Customs and DEA officials, U.S. Marshals, three federal court reporters, a judicial law clerk, a secretary, and several of [his] co-defendants and their respective attorneys,” alleging that these defendants “knowingly and willfully conspired to convict him falsely by fabricating' testimony and other evidence against him.” Id. at 1064. The district court dismissed the claims, finding that they were barred by the Supreme Court’s decision in Heck v. Humphrey. Id. at 1065.[7] We affirmed the district court’s dismissal on this ground and noted, in passing, that the plaintiff was entitled to “bring his Bivens damages claims in the future should he meet the requirements of Heck. ” Id. With this language, we did not opine on whether we would find a Bivens remedy to be available if Abella ever became eligible to challenge his conviction with a civil suit, let alone suggest that Bivens should be applied in the immigration context. We merely reiterated that our affirmance of the district court’s decision was based only on the plaintiffs failure to satisfy Heck’s requirements. Abella in no way suggests that we should recognize an expanded Bivens remedy in this context.
y.
- Thus, we hold that the- district court erroneously concluded that it- had no jurisdiction to entertain the merits of Alvarez’s claim under 8 U.S.C. § 1252(g). However, we fully agree that no Bivens remedy is *1213 available when a plaintiff claims that he was unconstitutionally detained after being ordered removed by an immigration judge. Accordingly, we AFFIRM.

. The district court had found that the condition that Alvarez not travel 50 miles beyond his residence would deny him access to the courts in the Middle District of Georgia and prevent him from appearing for his habeas action and any future suits. The court also struck the requirement that Alvarez abstain from all contact with eleven enumerated individuals. Next, the court struck a provision requiring Alvarez to "make good faith and timely efforts to obtain a travel document to effectuate [his] removal” — concluding that an alien has no obligation to effectuate his own removal. Finally, the trial court struck a provision reserving ICE’s right to modify the terms of Alvarez’s release at any time. The district court sua sponte reinstated the condition providing that Alvarez may not contact the named individuals. Alvarez, 454 Fed.Appx. at 773-74.

. Alvarez also asserted other claims not at issue on appeal: "Fraud in immigration pro *1200 ceedings and upon [the] court” (Count IV); "Deprivation of [his] freedom and liberty because of his political beliefs (Count V); False imprisonment (Count VI); Malicious prosecution (Count VII); and Intentional infliction of emotional distress (Count VIII). He 'subsequently conceded that he had failed to state a claim in Count V. As for the state law tort claims, the government moved to dismiss them, but withdrew its motion in light of the district court’s ruling that it lacked subject matter jurisdiction.

. In some instances, the complaint also appears to challenge the conduct of the Department of Justice attorneys who were involved in negotiating Alvarez’s plea agreement for weapons charges. Thus, for example, he alleges that their commitment to use their best efforts to timely resolve his immigration status was "a hollow promise” because "neither the Department of Justice nor ICE did anything to make a decision regarding [his] immigration status.” Notably, however, Alvarez did not name these attorneys as defendants, nor did he assert that they participated in the allegedly unlawful ICE detention on which he bases his constitutional claims. The Supreme Court has made clear that to state a Bivens claim, "a plaintiff must plead that each Government-official 'defendant, • through the official’s own individual actions has violated the Constitution.” Ashcroft v. Iqbal, 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Thus, to the extent Alvarez challenges conduct by the Department of Justice attorneys who negotiated his plea agreement/ we reject his pleadings as being wholly insufficient to state a-claim.

. The Second Circuit has also considered a related question — namely whether a Bivens claim is available when a plaintiff alleges constitutional violations that occurred during extraordinary rendition. Arar, 585 F.3d at 572. However, the opinion focused almost exclusively on special factors counseling hesitation that are not implicated by Alvarez’s claims— such as the need to examine classified information, id. at 576, the impossibility of conducting proceedings in open court, id. at 576-77, the potential for relationships with foreign governments to come under scrutiny, id. at 578, and the possibility that recognizing a Bivens remedy would “make the government 'vulnerable to graymail,’ id. at 578 (quoting Tenet v. Doe, 544 U.S. 1, 11, 125 S.Ct. 1230, 161 L.Ed.2d 82 (2005)).

. At first glance, De La Paz seems factually distinguishable from Mirmehdi — and from Alvarez’s allegations — because it involved a Fourth Amendment challenge to decisions by Customs and Border Patrol agents to stop and detain illegal aliens near the border between' the United States and Mexico. Id. at 370-71. However, the Fifth Circuit characterized the issue before it as “whether Bivens extends to claims arising from civil immigration apprehensions and detentions, other than those alleging unconstitutionally excessive force,” id. at 375, and explicitly rejected the argument that Mirmehdi was distinguishable. See id. at 375 n. 7.

. We need not, and do not, decide whether a Bivens remedy would be available in, cases of physical abuse, see. De La Paz, 786 F.3d at 374, or punitive confinement conditions, Turkmen v. Hasty, 789 F.3d 218, 235-3, 7, (2d Cir.2015). Alvarez does not allege that he was mistreated during his detention, and thus we have no occasion to grapple with the unique issues that these types of allegations could present. See Gupta, 737 F.3d at 696 (Wilson, J., concurring in denial of rehearing) ("Should the scenario come along where an alien is ..: physically beaten during the course of what ought to be a peaceful arrest arising from a decision to commence removal proceedings, judicial review would likely be necessary see also Turkmen, 789 F.3d at 235-36 (noting that "[b]oth'the Supreme Court and [the Second] Circuit have recognized a Bivens remedy for constitutional challenges to [punitive] conditions of confinement” and extending the remedy to the immigration detention context).

. Heck and its progeny preclude 42 U.S.C. § 1983 and -Bivens actions "to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid,” unless the plaintiff shows that "the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court’s issuance of a writ of habeas corpus.” Abella, 63 F.3d at 1065 (quoting Heck, 512 U.S. at 486-87, 114 S.Ct. 2364).